Hunter Harrison HAAS, Appellant,

v.

The STATE of Texas, Appellee.

No. 10-04-00217-CR.

Court of Appeals of Texas, Waco.

Aug. 3, 2005.

---

3. The assault on Curbello occurred on the day before the altercation.

Harold J. Laine, Jr., Beaumont, for appellant.

John D. Kimbrough, Orange County Dist. Atty., Orange, for appellee.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION

BILL VANCE, Justice.

### I. Introduction

Appellant Hunter Haas pled guilty to felony possession of marihuana (between five and fifty pounds). Haas received deferred adjudication probation for ten years and was ordered to pay a $1,500 fine and to serve forty-five days in county jail as conditions of probation. In two issues, Haas complains that the trial court erred in denying his motion to suppress because his detention and the subsequent search of his car were unconstitutional. We will affirm.

### II. Factual Background

The evidence at the hearing on Haas's motion to suppress was the testimony of Brad Frye, a Texas Department of Public Safety (DPS) trooper, and a videotape of Frye's traffic stop of Haas, which occurred on November 9, 2002, at approximately 11:00 a.m. We have reviewed the testimony and the videotape.

Frye testified that he had been with the DPS since 1994 and a peace officer since 1990. On the morning of November 9, he was on patrol on Interstate 10 with his drug-sniffing dog, B.J., whom he had worked with for eleven months. He stopped Haas for speeding and following too closely while Haas was driving eastbound in Orange County near Vidor. According to Frye, his radar "clocked" Haas's car at 74 m.p.h. (in a 70 m.p.h. zone), and Haas's car, a 1997 two-door Cadillac, ran up on an SUV and nearly collided with it. After Haas pulled over on the highway shoulder and Frye pulled up behind him, Frye checked the license plate number (a dealer's tag) by radio. Frye then got out of his patrol car, walked to Haas's passenger-side window, and informed him of the purpose for the stop. Frye asked Haas to get out of his car so that he could hear Haas better, as traffic was noisily passing by. Haas got out of his car and walked around to the rear of it, and Frye asked to see his driver's license. Frye said that he had looked in the car and saw maps spread out in the front and the back of the car.

After Haas handed Frye his license, Frye asked Haas if he still lived at the address in Mississippi that was on the license. Haas responded affirmatively and then volunteered the alleged purpose of his trip: Haas said that he was a car dealer, that he had just bought the car at an auction, that he had driven the car to Houston to try to sell it to "somebody," but that they didn't want it. Frye testified that Haas's quick volunteering of where he had been and what he had been doing just in response to a question about Haas's address "threw him off," was unusual, and

made Frye immediately suspicious of Haas. Frye also said that Haas was "a nervous wreck." Frye testified that most people he pulls over are nervous, but that Haas's nervousness escalated. Frye then asked where Haas had bought the car, and Haas said that he got it at a car auction in Mississippi. Frye then asked where Haas was going with the car. Haas replied that he went to Houston to "check on an auction" and a "couple of friends" because he thought they might be interested in the car, but they didn't have the money for it. Frye said that Haas's explanation made him more suspicious because he couldn't understand why Haas would have driven the car from Mississippi to Houston without knowing if the purported purchaser wanted to buy it or could buy it.

Frye then asked Haas what car auction in Houston he had gone to, but Haas responded that he had just gone to "check on it." Frye said that this response also made him suspicious. Frye next asked Haas how he was going to get home if he sold the car, and Haas said he would have taken a bus. Frye testified that, at this point, he thought Haas was just "making up stuff" to please Frye.

Frye next asked Haas for paperwork for the car, and Haas began to search for it. While Haas was searching, Frye asked him what kind of work he did, and Haas said he was just starting his own business buying and selling used cars. Haas volunteered that he was going to take a loss on this car because the original motor was blown and he had to put a used motor in it. Frye asked Haas why he didn't just put the car back in a car auction if it needed a new motor, and Haas responded that it would not have brought anything. Frye concluded that Haas was now changing his story, as Haas had earlier said that he was going to check on a car auction in Houston.

They then reviewed the car's paperwork, and Frye pointed out that the title had not been signed by the previous owner.

At 11:03:49, as shown by the videotape,[1] Frye told Haas that he was just going to issue him a warning if Haas's driver's license was valid. Frye then asked Haas if he had been driving all night, and Haas said that he had not been. In response to Haas's statement that his cruise control had been set on 70 m.p.h., they then discussed that the car's speedometer may be inaccurate because the tires on it may be a different size from the original tires.

Frye next asked Haas when he had left Mississippi to go to Houston, and after hesitating, Haas said that he had left Friday (the day before). Haas again volunteered that he had talked to a "couple of people," that they didn't want the car, and that he couldn't find information on the auction in Houston. Haas then volunteered that he was "mostly just test driving" the car. Frye said Haas would not keep eye contact with him and got more nervous.

Frye asked Haas where he had stayed the night before, and Haas said that he stayed at a motel and retrieved a motel receipt from the car. The time was now 11:05. Frye went to his patrol car and called in Haas's driver's license at 11:06 and began writing the warning. Frye testified that he thought Haas's story—with the timing and the alleged purpose for Haas's trip—did not add up and did not make sense. Haas and Frye discussed the car again, and in response to Frye, Haas said that he had had only one car in his car business—the one that he was driving.

At 11:07:30, Frye called in for the report on Haas's driver's license, and he then asked Haas who he had been to visit.

1. All times mentioned are those shown by the videotape.

Haas, hesitating, answered "Jeff." When Frye asked what Jeff's last name was, Haas hesitated and said, "Actually, it was Jeff Farr." Frye asked how long Haas had known Jeff, and Haas said that Jeff was his cousin's friend. Haas then volunteered that Jeff had looked at the car but that he didn't really have extra money for it. Frye asked Haas why he had not stayed with Jeff (whom Haas had said was originally from Mississippi and had moved to the Houston area), instead of at a motel, and Haas said that Jeff had kids and he did not want to "barge in" on them. Frye testified that at this time (11:08:30), Haas was so nervous that his hands were shaking. The videotape shows Frye commenting to Haas on how nervous Haas appeared and on his shaky hands.

Frye then commented that nervous people whom he didn't know concerned him, and he asked Haas if he was carrying any weapons. Haas replied that he was not, and Frye frisked Haas for weapons and found none. Haas asked if he was getting a ticket, and Frye replied that he was giving him a break and only issuing him a warning. They talked again about the car's speedometer, tires, and motor, and then Frye asked Haas to sign the warning, and Haas complied. The time was 11:10.

At 11:10:30, Frye asked Haas if he had any weapons or anything illegal with him. Haas said that he did not, and Frye asked Haas if he would have a problem with Frye's searching the car to make sure there were no guns or drugs in it. Frye testified that he asked for consent to search the car because Haas's actions, stories, and nervousness led Frye to conclude that some type of criminal act was occurring. And Frye said that with Houston being a hub for drugs and with Haas's story for going to Houston not making sense, he knew that "something was going on."

Haas said that he would rather Frye not search. Frye testified that at this point he did not have probable cause to search the car.

At 11:12, Frye said that he would then run his dog B.J. around the car and make sure the dog did not get an alert, and if there was nothing, then he would let Haas go on his way. Haas asked how long the dog would take, and Frye said that it would just take a few minutes because the dog was in his patrol car. Because they were on the shoulder of a busy interstate highway, Frye did not want to run his dog around the car without a back-up to watch the traffic and Haas while Frye and the dog were going around the car. At 11:13, Frye called for another officer to come to the scene and help.

At 11:25, another police officer showed up; at 11:28, a second officer showed up; and at 11:29, a third officer arrived. At 11:32, Frye walked B.J. around Haas's car. B.J. quickly alerted to the left rear of Haas's car. Frye then informed Haas that because his dog had alerted to the presence of narcotics in the car, he had probable cause to search the car. Frye first searched the interior and found nothing. At 11:34, Frye opened the trunk and found a suitcase with a strong marihuana odor. Frye then arrested and handcuffed Haas and read him his Miranda warnings, after which he asked Haas if he wanted to say how much marihuana was in the suitcase. Haas responded that because Frye was going to find out anyway, he would tell him. Haas said that the quantity was just under fifteen pounds. At this point, the entire stop had lasted about 35 minutes. At 11:42, Frye opened the suitcase and found a plastic bag containing almost fifteen pounds of marihuana.

## III. Issues Presented

In his first issue, Haas asserts that the trial court erred and abused its discretion

in denying his motion to suppress because the detention was without reasonable suspicion. His second issue is that the trial court erred and abused its discretion in denying his motion to suppress because the search of his car was without probable cause because it was tainted by the illegal detention. In both issues, Haas asserts that the detention and search violated his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution and article 1, section 9 of the Texas Constitution.

## IV. Burden of Proof and Standard of Review

■ To suppress evidence on an alleged violation of Fourth Amendment rights, the defendant bears the initial burden of producing evidence that rebuts the presumption of proper police conduct. *Ford v. State*, 158 S.W.3d 488, 492 (Tex.Crim.App. 2005). A defendant satisfies this burden by establishing that a search or seizure occurs without a warrant. *Id.* Once the defendant makes this showing, the burden shifts to the State, which must then establish that the search or seizure was conducted with a warrant or was reasonable. *Id.*

■ We have previously articulated the bifurcated standard of review of a trial court's denial of a motion to suppress:

A trial court's denial of a motion to suppress is reviewed for abuse of discretion. *Oles v. State*, 993 S.W.2d 103, 106 (Tex.Crim.App.1999). There is an abuse of discretion "when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Cantu v. State*, 842 S.W.2d 667, 682 (Tex.Crim. App.1992); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App.1990) (op. on reh'g).

The trial court's findings of fact are given "almost total deference," and in the absence of explicit findings, the appellate court assumes the trial court made whatever appropriate implicit findings that are supported by the record. *Carmouche v. State*, 10 S.W.3d 323, 327–28 (Tex.Crim.App.2000); *Guzman v. State*, 955 S.W.2d 85, 89–90 (Tex.Crim. App.1997). However, the application of the relevant law to the facts, including Fourth Amendment search and seizure law, is reviewed *de novo*. *Carmouche*, 10 S.W.3d at 327. Also, when the facts are undisputed and we are presented with a pure question of law, *de novo* review is proper. *Oles*, 993 S.W.2d at 106. Thus, for example, when the issue to be determined on appeal is whether an officer had probable cause, "the trial judge is not in an appreciably better position than the reviewing court to make that determination." *Guzman*, 955 S.W.2d at 87. Therefore, although due weight should be given to the inferences drawn by trial judges and law enforcement officers, determinations of matters such as reasonable suspicion and probable cause should be reviewed *de novo* on appeal. *Id.* (citing *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996)).

*Davis v. State*, 74 S.W.3d 90, 94–95 (Tex. App.-Waco 2002, no pet.).

## V. Applicable Law

### A. Initial Traffic Stops

■ A law enforcement officer may lawfully stop a motorist who commits a traffic violation. *Garcia v. State*, 827 S.W.2d 937, 944 (Tex.Crim.App.1992). In general, the decision to stop an automobile is reasonable when an officer has probable cause to believe that a traffic violation has occurred. *Walter v. State*, 28 S.W.3d 538,

**50**

542 (Tex.Crim.App.2000); *Wolf v. State,* 137 S.W.3d 797, 801 (Tex.App.-Waco 2004, no pet.); *see also Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). A traffic stop is a "seizure" within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention is quite brief. *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979); *see United States v. Brigham,* 382 F.3d 500, 506 (5th Cir.2004) (en banc); *Francis v. State,* 922 S.W.2d 176, 178 (Tex.Crim.App.1996).

Officers may stop and briefly detain persons (*Terry* stops) suspected of criminal activity on less information than is constitutionally required for probable cause to arrest. *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). Because a routine traffic stop is more analogous to an investigative detention than a custodial arrest, such stops are analyzed as *Terry* stops. *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984); *Brigham,* 382 F.3d at 506. An investigative detention—either as a part of, or apart from, a traffic stop—is also a seizure for Fourth Amendment purposes. *See Francis,* 922 S.W.2d at 178; *Powell v. State,* 5 S.W.3d 369, 375 (Tex.App.-Texarkana 1999, pet. ref'd). Therefore, a traffic stop and any concomitant investigative detention must be reasonable under the United States and Texas Constitutions. *See* U.S. CONST. amend. IV; TEX. CONST. art. I, § 9. The Fourth Amendment protects against only *unreasonable* searches and seizures. *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879; *Walter,* 28 S.W.3d at 540 (citing *Minnesota v. Carter,*

525 U.S. 83, 88, 119 S.Ct. 469, 473, 142 L.Ed.2d 373 (1998)).

During a routine traffic stop, an officer may detain an individual to check for outstanding warrants. *Walter,* 28 S.W.3d at 542 (citing *Davis v. State,* 947 S.W.2d 240, 245 n. 6 (Tex.Crim.App.1997)). An officer may also request a driver's license, liability insurance information, vehicle ownership information, the driver's destination, and the purpose of the trip.[2] *Veal v. State,* 28 S.W.3d 832, 835 (Tex. App.-Beaumont 2000, pet. ref'd) (citing *Powell,* 5 S.W.3d at 377, and *Mohmed v. State,* 977 S.W.2d 624, 628 (Tex.App.-Fort Worth 1998, pet. ref'd)). While an officer is awaiting a computer warrant check, questioning about matters unrelated to the initial traffic stop does not violate the Fourth Amendment because such questioning does not extend the duration of an initial valid seizure. *United States v. Sharpe,* 470 U.S. 675, 687, 105 S.Ct. 1568, 1576, 84 L.Ed.2d 605 (1985); *United States v. Shabazz,* 993 F.2d 431, 437 (5th Cir. 1993). In some circumstances, however, extensive questioning about unrelated matters may exceed the scope of the initial stop. *United States v. Kelley,* 981 F.2d 1464, 1470 (5th Cir.1993).

**B. Reasonable Suspicion**

Under *Terry,* a temporary investigative detention—a Fourth Amendment seizure—is reasonable, and therefore constitutional, if: (1) the officer's action was justified at the detention's inception; and (2) the detention was reasonably related in scope to the circumstances that justified the interference in the first place.

---

**2.** But when an officer while conducting a valid traffic stop asks routine questions about matters such as the driver's destination and the purpose of the trip, the individual is not legally obligated to answer, may not be compelled to answer, and may not be arrested for refusing to answer. *United States v. $404,905.00 in U.S. Currency,* 182 F.3d 643, 647 n. 2 (8th Cir.1999) (citing *Terry,* 392 U.S. at 34, 88 S.Ct. at 1886 (White, J., concurring)).

*Terry,* 392 U.S. at 19–20, 88 S.Ct. at 1879. For the officer's initial action to be justified under the first *Terry* prong, we ask whether there existed specific, articulable facts that, taken together with rational inferences from those facts, reasonably warranted that intrusion. *Id.,* 392 U.S. at 21, 88 S.Ct. at 1880; *see also Davis,* 947 S.W.2d at 242. Specifically, the officer must have a reasonable suspicion that some activity out of the ordinary is occurring or has occurred, some suggestion to connect the detainee with the unusual activity, and some indication that the unusual activity is related to crime.[3] *See Davis,* 947 S.W.2d at 244 (citing *Garza v. State,* 771 S.W.2d 549, 558 (Tex.Crim.App.1989)). We give due weight, not to the officer's inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences that he is entitled to draw from the facts in light of his experience. *See id.* at 243 n. 3. An investigative detention that is not based on reasonable suspicion is unreasonable and thus violates the Fourth Amendment. *Id.*

 Even in the absence of reasonable suspicion, a sniff of the outside of a vehicle by a trained canine *during* a routine, valid traffic stop is not a search within the meaning of the Fourth Amendment. *Illinois v. Caballes,* 543 U.S. 405, ——, 125 S.Ct. 834, 837–38, 160 L.Ed.2d 842 (2005); *1979 Pontiac Automobile v. State,* 988

S.W.2d 241, 243–44 (Tex.App.-Eastland 1998, no pet.); *see also United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 2644–45, 77 L.Ed.2d 110 (1983) (canine sniff of luggage not a search within Fourth Amendment).[4]

 A seizure that is reasonable at its inception may violate the Fourth Amendment by virtue of its excessive intensity and scope. *Davis,* 947 S.W.2d at 243. Thus, under the second *Terry* prong, an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *See Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). Once the reason for the stop has been satisfied, the stop may not be used as a "fishing expedition for unrelated criminal activity." *Davis,* 947 S.W.2d at 243 (quoting *Ohio v. Robinette,* 519 U.S. 33, 41, 117 S.Ct. 417, 422, 136 L.Ed.2d 347 (1996) (Ginsberg, J., concurring)).

 Also, the scope of the seizure must be restricted to that necessary to fulfill the seizure's purpose. *Royer,* 460 U.S. at 500, 103 S.Ct. at 1325. "There is, however, no constitutional stopwatch on traffic stops. Instead, the relevant question in assessing whether a detention extends beyond a reasonable duration is 'whether the police diligently pursued a means of investigation that was likely to

---

3. Put another way, "an officer conducts a lawful temporary investigative detention when the officer has reasonable suspicion to believe that an individual is violating the law." *Ford,* 158 S.W.3d at 492 (citing *Balentine v. State,* 71 S.W.3d 763, 768 (Tex.Crim. App.2002)). "Reasonable suspicion exists if the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person actually is, has been, or soon will be engaged in criminal activity." *Id.*

4. *But see Mohmed,* 977 S.W.2d at 628 (pre-*Caballes* case holding that exterior canine sweep of vehicle requires reasonable suspicion that automobile contains narcotics) (citing *Crockett v. State,* 803 S.W.2d 308, 310–11 (Tex.Crim.App.1991) (reasonable suspicion required for canine sniff of railway passenger's luggage)); *cf. Walter,* 28 S.W.3d at 542 (pre-*Caballes* case noting that U.S. Supreme Court has not addressed whether canine sniff alone is a detention or whether calling in a canine unit requires reasonable suspicion, but assuming pre-*Caballes* that reasonable suspicion was required).

confirm or dispel their suspicions quickly.'" *Brigham*, 382 F.3d at 511 (quoting *Sharpe*, 470 U.S. at 686, 105 S.Ct. at 1575). An investigative detention following a traffic stop "may last as long as is reasonably necessary to effectuate the purpose of the stop, including the resolution of reasonable suspicion, supported by articulable facts within the officer's professional judgment, that emerges during the stop." *Id.* at 512. The Supreme Court has expressly rejected placing a rigid time limitation on *Terry* investigative detentions. *Kothe v. State*, 152 S.W.3d 54, 64–65 (Tex.Crim.App.2004) (citing *Sharpe*, 470 U.S. at 685–86, 105 S.Ct. at 1575 (declining to "establish a per se rule that a 20–minute detention is too long" under *Terry* )).[5]

■ On appeal, we review the reasonableness of the detention from the same perspective as the officer: using an objective standard, we ask whether the facts available at the moment of detention would warrant a person of reasonable caution in the belief that the action taken was appropriate. *See Terry*, 392 U.S. at 21–22, 88 S.Ct. at 1880; *Davis*, 947 S.W.2d at 243. The determination of reasonable suspicion is made by considering the totality of the circumstances. *Ford*, 158 S.W.3d at 492–93.

### C. Prolonged Investigative Detention

■ Once the traffic stop investigation is concluded, the officer must no longer detain the driver, who must be permitted to leave. *Kothe*, 152 S.W.3d at 63–64; *see Perales v. State*, 117 S.W.3d 434, 439 (Tex.App.-Corpus Christi 2003, pet. ref'd). An officer may request consent to search a vehicle after the purpose of the traffic stop

has been accomplished, as long as the request is reasonable under the circumstances and the officer has not conveyed a message that compliance with the officer's request is required. *Leach v. State*, 35 S.W.3d 232, 235–36 (Tex.App.-Austin 2000, no pet.); *Simpson v. State*, 29 S.W.3d 324, 328 (Tex.App.-Houston [14th Dist.] 2000, pet. ref'd). But if consent is refused, the officer must have reasonable suspicion to continue to detain the person stopped. *Id.*

■ If, during a valid traffic stop and detention, the officer develops reasonable suspicion that the detainee is engaged in criminal activity, prolonged or continued detention is justified. *See Davis*, 947 S.W.2d at 244; *Perales*, 117 S.W.3d at 439. Additional facts and information discovered by an officer during a lawful detention may form the basis for a reasonable suspicion that another offense has been or is being committed. *See Razo v. State*, 577 S.W.2d 709, 711 (Tex.Crim.App. [Panel Op.] 1979); *Powell*, 5 S.W.3d at 378–79; *Mohmed*, 977 S.W.2d at 628. Articulable facts coming to the officer's knowledge during the proper stop or detention may justify further investigation. *Razo*, 577 S.W.2d at 711; *Mohmed*, 977 S.W.2d at 628. More specifically, if the valid traffic stop evolves into an investigative detention of other criminal activity (such as transporting illegal drugs) so that a canine sniff can take place, reasonable suspicion is required to prolong the detention. *Wolf*, 137 S.W.3d at 802; *Hill v. State*, 135 S.W.3d 267, 269 (Tex.App.-Houston [14th Dist.] 2005, pet. ref'd); *Sims v. State*, 98 S.W.3d 292, 295 (Tex.App.-Houston [1st Dist.] 2003, pet. ref'd); *McQuarters v. State*, 58

---

5. The Supreme Court explained: "While it is clear that 'the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion,' we have emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Sharpe*, 470 U.S. at 685, 105 S.Ct. at 1575 (citation omitted).

S.W.3d 250, 256–57 (Tex.App.-Fort Worth 2001, pet. ref'd).

## VI. Analysis

Haas does not dispute the validity of the initial traffic stop. Instead, and citing several federal cases, Haas contends that once Frye issued the warning and the purpose for the stop had concluded, Frye should not have detained him any longer. *See United States v. Jones,* 234 F.3d 234 (5th Cir.2000); *United States v. Dortch,* 199 F.3d 193 (5th Cir.1999); *United States v. Diaz,* 2004 WL 1260103 (W.D.Tex. June 2, 2004). Haas claims that instead of letting him go at the conclusion of the traffic stop, Frye then impermissibly commenced an investigative detention relating to drugs without reasonable suspicion. While the cases Haas cites support his contention, the record does not.

### A. The Detention

■ Frye's questioning of Haas that took place from the time of the initial stop until the completion of the warning was legitimate, even when unrelated to the speeding violation. *See Dortch,* 199 F.3d at 198; *Shabazz,* 993 F.2d at 437. Moreover, the additional information—articulable facts and rational inferences from those facts—that Frye discovered or learned during the lawful detention could form the basis for reasonable detention and justify further investigation. *See Razo,* 577 S.W.2d at 711; *Powell,* 5 S.W.3d at 378–79; *Mohmed,* 977 S.W.2d at 628; *Bustamante v. State,* 917 S.W.2d 144, 146 (Tex.App.-Waco 1996, no pet.); *see also Wolf,* 137 S.W.3d at 804 (the stop may be lengthened to accommodate its new justification).

Contrary to Haas's contention, after giving the warning, Frye did not "switch gears" and begin a fishing expedition relating to drugs. Instead, both Frye's testimony and the videotape reveal that the information that formed the basis for Frye's suspicion was obtained by Frye at the very beginning of the stop—when Haas volunteered his alleged trip purpose—and that during the lawful stop Frye followed up on the volunteered information with legitimate questioning. Throughout the duration of the traffic stop—the driver's license and license tag checks and the review of the car's paperwork—the questioning and conversation between Haas and Frye about the car and Haas's trip continued to provide Frye with additional information, including Haas's increasing nervousness, that contributed to Frye's suspicion. *See Powell,* 5 S.W.3d at 378–79 (officer's continued detention after warning issued was not a fishing expedition because it was based on officer's reasonable suspicion developed *before* warning was issued). The evidence shows that immediately after he had issued the warning, Frye then simply asked Haas if he had any guns or drugs and then asked for consent to search the car. Under these circumstances, these questions were not inappropriate. *See id.* at 379 (officer was justified in post-citation questioning because he had developed reasonable suspicion and was confirming inconsistency); *see also Leach,* 35 S.W.3d at 235–36 (officer may request consent to search vehicle after purpose of stop has been accomplished, as long as request is reasonable under the circumstances and officer has not conveyed message that compliance with his request is required); *Simpson,* 29 S.W.3d at 328 (same).

After issuing the warning, Frye could detain Haas only if he had reasonable suspicion. Haas contends that Frye did not have reasonable suspicion to continue or prolong Haas's detention and to wait for help from other officers. Haas asserts that his nervousness and his talk about his business and his trip to Houston could not

give rise to reasonable suspicion. We disagree.

▮ Frye articulated three basic grounds for his decision to detain Haas so that his dog could sniff the car: (1) Haas volunteered a lot of information; (2) Frye thought the story was implausible and inconsistent and became more implausible and inconsistent as Frye questioned Haas;[6] and (3) Haas was increasingly nervous and avoided eye contact.[7] Increasing or extreme nervousness and conflicting or implausible information can, along with other factors, raise a reasonable suspicion. *See Bustamante,* 917 S.W.2d at 146; *see also Brigham,* 382 F.3d at 504–05, 508–12; *LeBlanc v. State,* 138 S.W.3d 603, 605–08 (Tex.App.-Houston [14th Dist.] 2004, no pet.); *Sims,* 98 S.W.3d at 296; *Powell,* 5 S.W.3d at 378–79.

Based on our review of the totality of the circumstances, in light of Frye's experience and knowledge, we find that the trial court was justified in determining that Frye had reasonable suspicion to prolong Haas's detention so that Frye could conduct a canine sniff on Haas's car.[8] The trial court did not err or abuse its discretion in denying Haas's motion to suppress. We overrule Haas's first issue.

## B. The Search

▮ Haas's second issue is premised in part on his first issue. He asserts that the search of the car was done without probable cause and was tainted by an illegal detention. We have found that the detention was legal. As for probable cause, once the dog alerted on the car, Frye had probable cause to search the car without a warrant. *United States v. Cabello,* 92 Fed. Appx. 983, 984–85 (5th Cir.2004) (citing *United States v. Williams,* 69 F.3d 27, 28 (5th Cir.1995)); *Harrison v. State,* 7 S.W.3d 309, 311 (Tex.App.-Houston [1st Dist.] 1999, pet. ref'd); *Ortiz v. State,* 930

---

6. *Cf. United States v. Sokolow,* 490 U.S. 1, 9, 109 S.Ct. 1581, 1586, 104 L.Ed.2d 1 (1989) ("While a trip from Honolulu to Miami, standing alone, is not a cause for any sort of suspicion, here there was more: surely few residents of Honolulu travel from that city for 20 hours to spend 48 hours in Miami during the month of July."); *Hill,* 135 S.W.3d at 271 (officer thought it implausible that someone would make one-day trip from Florida to Houston to buy one or more trucks).

7. "Extreme nervousness has traditionally been a fact that law enforcement has used in its list of elements leading up to either reasonable suspicion or probable cause." *Veal,* 28 S.W.3d at 837 (citing *Sokolow,* 490 U.S. at 3, 109 S.Ct. at 1583). "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow,* 528 U.S. 119, 124, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000). But nervousness alone is not sufficient to be a factor giving rise to reasonable suspicion. *LeBlanc v. State,* 138 S.W.3d 603, 608 n. 6 (Tex.App.-Houston [14th Dist.] 2004, no pet.).

8. Courts must "consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Sharpe,* 470 U.S. at 685, 105 S.Ct. at 1575 (citations omitted). Based on the record in this case—Frye's diligence and especially the proximity of Haas's car to the busy interstate highway (obvious on the videotape), which Frye claimed as a reason for needing back-up help—the twenty-minute wait for back up to arrive and the canine-sniff to begin was not unreasonable. *See, e.g., Sims,* 98 S.W.3d at 294 (officer and driver waited twenty minutes for canine unit to arrive to conduct canine sniff); *see also Sharpe,* 470 U.S. at 686–88, 105 S.Ct. at 1575–77 (twenty-minute detention was reasonable); *Place,* 462 U.S. at 709–10, 103 S.Ct. at 2645–46 (ninety-minute detention of defendant's luggage was unreasonable when agents did not act diligently to minimize the delay); *United States v. Bloomfield,* 40 F.3d 910, 917 (8th Cir.1994) (en banc) (one-hour delay for drug dog to arrive not unreasonable); *United States v. Frost,* 999 F.2d 737, 741–42 (3d Cir.1993) (wait of almost one hour for drug dog was reasonable).

S.W.2d 849, 856 (Tex.App.-Tyler 1996, no pet.). We overrule Haas's second issue.

## VII. Conclusion

Having overruled Haas's two issues, we affirm the judgment.