

# NUMBER 13-07-516-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**JOSE ISAAC SANCHEZ,**                                          **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                          **Appellee.**

On appeal from the 36th District Court of San Patricio County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Benavides**
**Memorandum Opinion by Justice Benavides**

Appellant, Jose Isaac Sanchez, pleaded nolo contendere to the offense of possession of less than one gram of cocaine. TEX. HEALTH & SAFETY CODE ANN. §§ 481.115(b), 481.102(3)(D) (Vernon 2003). The trial court sentenced Sanchez to eighteen months in the Texas Department of Criminal Justice–State Jail Division, suspended the

sentence for three years, and placed Sanchez on community supervision. The trial court also imposed a $1,500 fine and suspended Sanchez's driver's license. On appeal, Sanchez argues that the trial court erred by denying his motion to suppress evidence. We affirm.

## I. BACKGROUND

Sanchez filed a motion to suppress cocaine seized from his truck after a dog alerted to its presence during a traffic stop. The trial court heard evidence on the motion, from which the following narrative is derived.

Trooper Clayton Cohea testified at the hearing that on November 14, 2006, Sanchez was driving a tractor-trailer northbound on U.S. Highway 77. Sanchez was delivering a load of limes. Using radar equipment, Cohea determined that Sanchez was traveling at 39 miles per hour in a 35 mile-per-hour zone. Cohea testified that when he "pulled up next to" Sanchez, he was still traveling at 39 miles per hour.

Cohea stated that Highway 77 between Brownsville and Corpus Christi is well-known as a major corridor for illegal activity, including the trafficking of drugs and illegal immigrants. Cohea employed his emergency lights, activating his dashboard camera. According to the time-stamp on the video, the stop occurred at 2:42 a.m.[1] Before speaking with Sanchez, Cohea walked to the front of the vehicle and, using his flashlight, checked the vehicle's registration and inspection stickers located on the windshield.

While Cohea's light was pointed at the windshield, he noticed Sanchez behaving nervously. Cohea saw Sanchez making "furtive movements in the cab" and reaching

---

[1] The video actually notes the hour as 1:42 a.m., but the officer clarified that the time was an hour behind because it had not been adjusted to a daylight savings time change.

2

around, above and below himself, "frantically . . . excitedly, quickly." Sanchez then zipped the curtain behind the driver's seat closed, which seemed unusual to Cohea. Sanchez later told Cohea that he zipped the curtain closed to keep cigarette smoke "from getting into his vehicle."

Cohea approached Sanchez, identified himself, and told Sanchez that he stopped the truck because Sanchez was speeding. After Cohea asked for Sanchez's license, insurance, and bill of lading, Sanchez reached around and looked around quickly in an excited manner. Cohea testified that Sanchez looked as if he were lost and not the way "a normal truck driver would do [sic]."

Sanchez's hands were shaking considerably when he handed the documents to Cohea. Cohea testified that, based on his experience, the shaking was more than the usual nervousness a driver demonstrates when stopped. When Cohea inspected Sanchez's paperwork, he noticed it was not in order. Sanchez had written the wrong date in his logbook. It appeared that he had been "off" for a couple of days.

Cohea and Sanchez walked to the rear of the tractor-trailer, in front of the patrol car. When asked questions, Sanchez would not make eye contact with Cohea. Also, despite the cool November weather and the early hour, Cohea noticed sweat running down Sanchez's forehead and cheeks. Cohea also noticed that an artery in Sanchez's neck was visibly pulsating.

Cohea asked Sanchez what he was transporting. Sanchez responded that he was hauling a load of limes. This was consistent with his paperwork. Cohea then asked Sanchez how much he was being paid for his trip. Sanchez repeated the question to Cohea. Finally, Cohea asked Sanchez if there was anything illegal in his truck. Sanchez

3

then took two steps back from Cohea.

Based on his experience, Cohea felt he had probable cause to search the vehicle, and he asked Sanchez for permission at 2:55 a.m. At first, Sanchez refused. Cohea then called for a drug dog to inspect the vehicle. After the dog was en route from Refugio, Sanchez gave permission to search the trailer but not the cab of the truck. Cohea completed his search of the trailer at some time between 3:08 and 3:15 a.m. Cohea testified that a K9 handler arrived with a dog at 3:30 a.m. The dog alerted to the presence of narcotics at 3:32 a.m. Cohea then discovered cocaine in the cab of the truck.

At the hearing on the motion to suppress, the State played Cohea's dashboard camera video. The first part of the video shows the trailer being pulled over. Next, the video shows Cohea walking to the front of the truck. After several minutes, the video shows Cohea and Sanchez walk to the back of the truck. The video shows that when Cohea started to ask questions, Sanchez tended to look at his paperwork and avoid eye contact with Cohea. When Cohea asked if Sanchez had anything illegal in his truck, the video clearly shows Sanchez step back away from Cohea.

Sanchez was indicted for the offense of possession of a controlled substance. *Id.* §§ 481.115(b); 481.102(3)(D). Sanchez filed a motion to suppress the cocaine found in the cab of the truck, which he alleges was illegally obtained pursuant to an illegal detention. After a hearing, the trial court denied the motion.

The trial court's order states that it found (1) Sanchez was speeding at the time of the initial stop; (2) Sanchez was operating a commercial vehicle on Highway 77, which is a known corridor for smuggling drugs and undocumented persons into this state; (3) Sanchez frantically or excitedly began searching the cab of the truck when Cohea first

4

approached; (4) Sanchez was shaking and would not make eye contact with Cohea when they moved to the rear of the vehicle; (5) Sanchez's neck was pulsating and he was sweating as Cohea asked to search the vehicle; (6) Sanchez reported that he zipped the curtain to the cab shut in order to "keep cigarette smoke out of the sleeping compartment," yet no one was in the cab smoking; (7) Sanchez incorrectly noted his time off in the log book; and (8) Sanchez stepped back from Cohea when Cohea asked for consent to search the vehicle. The court held that "[e]ach of these items were described as indicators of deception and possible criminal action upon which the officer relied to request permission to search the truck and then to subsequently hold the defendant for some twenty extra minutes awaiting the arrival of a K-9 unit." Accordingly, the court held that ""[t]aken as a whole, the officer had sufficient information, which based on his experience, and all surrounding circumstances justified a temporary detaining of the defendant while a K-9 unit arrived." The court held that "[t]he additional delay caused by waiting for the K-9 unit was approximately twenty minutes," which was not unreasonable. The court denied the motion to suppress.

Sanchez then pleaded nolo contendere to the charges and was adjudged guilty. The trial court sentenced Sanchez to eighteen months' imprisonment, suspended the sentence for three years, and placed Sanchez on community supervision. The trial court also imposed a $1,500 fine. The trial court certified that this case did not involve a plea bargain and that Sanchez had a right to appeal. This appeal ensued.

## II. Standard of Review

By a single issue, Sanchez argues that the trial court erred by denying his motion to suppress. In a hearing on a motion to suppress evidence, the trial judge is the sole and

5

exclusive trier of fact and judge of the credibility of the witnesses as well as the weight to be given to their testimony. *See Romero v. State,* 800 S.W.2d 539, 543 (Tex. Crim. App.1990); *see also Taylor v. State,* 916 S.W.2d 680, 681 (Tex. App.–Waco 1996, pet. ref'd). As a general rule, almost total deference is given to a trial court's findings of historical facts, especially when those findings are based on an evaluation of credibility and demeanor. *See Guzman v. State,* 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). "The appellate courts . . . should afford the same amount of deference to trial courts' rulings on 'application of law to fact questions,' also known as 'mixed questions of law and fact,' if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor." *See id.* Mixed questions of law and fact not falling within this category are reviewed de novo. *Id.* Appellate inquiry into the issue of whether probable cause or reasonable suspicion exists for a warrantless search involves a mixed question of law and fact. *See id.* at 87; *see also State v. Arriaga,* 5 S.W.3d 804, 805 (Tex. App.–San Antonio 1999, pet. ref'd).

### III. Discussion

"Street encounters between citizens and police officers are incredibly rich in diversity. They range from wholly friendly exchanges of pleasantries or mutually useful information to hostile confrontations of armed men involving arrests, or injuries, or loss of life." *Terry v. Ohio*, 392 U.S. 1, 13 (1968). Federal and state courts have recognized three categories of interactions between police and civilians: (1) encounters; (2) investigative detentions; and (3) arrests. *Florida v. Royer*, 460 U.S. 491, 497-502 (1983); *Francis v. State*, 922 S.W.2d 176, 178 (Tex. Crim. App. 1996). Each category involves attendant rights and responsibilities. *Francis*, 922 S.W.2d at 178.

6

Encounters are distinguished from investigative detentions and arrests in that during an encounter, a police officer is not required to possess any particular level of suspicion, and the civilian is free to disregard the communication from the officer and leave. *See United States v. Mendenhall*, 466 U.S. 544, 553-54 (1980); *Francis*, 922 S.W. 2d at 178. Unlike an encounter, investigative detentions and arrests are "seizures." *Johnson v. State*, 912 S.W.2d 227, 235 (Tex. Crim. App. 1995). An investigative detention or stop is a brief detention of a person reasonably suspected of criminal activity to determine his identity or to maintain the status quo momentarily while obtaining more information. *See Adams v. Williams,* 407 U.S. 143, 146-47 (1972); *Terry,* 392 U.S. at 21; *Rhodes v. State,* 945 S.W.2d 115, 117 (Tex. Crim. App. 1997). The Texas Court of Criminal Appeals has described an investigative detention as "when an individual is confronted by a law enforcement officer who, under a display of law enforcement authority, temporarily detains a person for the purposes of an investigation." *Johnson*, 912 S.W. 2d at 235.

"Consistent with the principles set forth in *Terry v. Ohio*, . . . a police officer can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks evidence rising to the level of 'probable cause.'" *Arriaga,* 5 S.W.3d at 805. Under *Terry*, an investigative detention is reasonable, and therefore constitutional, if "(1) the officer's action was justified at the detention's inception; and (2) the detention was reasonably related in scope to the circumstances that justified the interference in the first place." *Haas v. State,* 172 S.W.3d 42, 50 -51 (Tex. App.–Waco 2005, pet. ref'd). For the officer's initial action to be justified under the first prong, the State must demonstrate that there "existed specific, articulable facts that, taken together with rational inferences from

7

those facts, reasonably warranted that intrusion." *Id.* at 51. The officer must "have a reasonable suspicion that some activity out of the ordinary is occurring or has occurred, some suggestion to connect the detainee with the unusual activity, and some indication that the unusual activity is related to crime." *Id.*

While a seizure may be reasonable at its inception, its excessive intensity and scope thereafter may render it unreasonable. *Id.* "Thus, under the second *Terry* prong, an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Id.* An initially-justified stop may not be continued past the time needed to resolve the reason for the stop in order to engage in a "fishing expedition for unrelated criminal activity." *Id.* (quoting *Davis v. State*, 947 S.W.2d 240, 243 (Tex. Crim. App. 1997)). That said, there is no "constitutional stopwatch" on traffic stops. *Id.* at 51 (quoting *United States v. Brigham*, 382 F.3d 500, 511 (5th Cir. 2004)). "An investigative detention following a traffic stop 'may last as long as is reasonably necessary to effectuate the purpose of the stop, including the resolution of reasonable suspicion, supported by articulable facts within the officer's professional judgment, that emerges during the stop.'" *Id.* at 51-52 (quoting *Brigham*, 382 F.3d at 512).

We begin with a brief discussion of the circumstances leading up to the moment Cohea first spoke with Sanchez. According to Cohea's testimony and the findings of the trial court, Sanchez was driving 39 miles per hour in a 35 mile-per-hour zone. Cohea determined this by using radar and driving along side the vehicle. In Texas, an officer may lawfully stop and detain a person for a traffic violation, including speeding and failure to control speed. *See* Tex. Trans. Code Ann. § 545.351 (Vernon 1999); *Chapnick v. State*, 25 S.W.3d 875, 877 (Tex. App.–Houston [14th Dist.] 2000, pet ref'd). It is uncontested that

Cohea was justified in initially detaining Sanchez.

While a detention may last no longer than necessary to effectuate the purpose of an initial stop, Texas courts have held that a law enforcement officer effecting a traffic stop is entitled to conduct a brief and minimally intrusive investigation. *Strauss v. State*, 121 S.W.3d 486, 491 (Tex. App.–Waco 2003, pet. ref'd). For example, the officer may (1) require the detainee to identify himself; (2) require the detainee to produce a valid driver's license and proof of insurance; (3) check for outstanding warrants; (4) ask about the driver's destination and purpose for the trip; and (5) if justified by safety and security concerns, direct the driver to step out from vehicle. *Id.*

Cohea was, therefore, justified in briefly detaining Sanchez to conduct this sort of minimal investigation. *See id.* The next question, therefore, is whether Cohea was justified in detaining Sanchez beyond this minimal investigation. "If, during a valid traffic stop and detention, the officer develops reasonable suspicion that the detainee is engaged in criminal activity, prolonged or continued detention is justified." *Haas,* 172 S.W.3d at 52. An officer's discovery of information during a lawful detention may form the basis of a reasonable suspicion that another offense is being committed, and further detention may be justified. *Id.* "More specifically, if the valid traffic stop evolves into an investigative detention of other criminal activity (such as transporting illegal drugs) so that a canine sniff can take place, reasonable suspicion is required to prolong the detention." *Id.*

Sanchez testified that he observed the following actions, which led him to a reasonable suspicion that Sanchez might be transporting drugs. First, while Cohea's light was pointed at the windshield, and before he spoke with Sanchez, he noticed Sanchez behaving nervously. Cohea saw Sanchez making "furtive movements in the cab" and

9

reaching around, above and below himself, "frantically . . . excitedly, quickly."

Sanchez argues that this Court should not rely on the trial court's finding of fact that he "frantically or excitedly search[ed] for something in the cab of the truck" because Cohea's testimony was impeached at the hearing. Sanchez's counsel pointed out that Cohea did not mention this fact in his offense report. Sanchez, however, ignores the standard of review—we must give almost total deference to the trial court's findings of historical fact. *Guzman,* 955 S.W.2d at 89. Accordingly, we take it as established that Sanchez frantically searched the cab of his truck. *Id.*

Second, Cohea viewed Sanchez through the front windshield acting in a way Cohea deemed to be suspicious, including zipping closed the curtain between the seats in the cab and the sleeper portion of the cab. Cohea stated that Sanchez's behavior was unusual in his experience, and commented that he had stopped "a lot of trucks." Cohea testified that Sanchez provided the implausible explanation that he was trying to keep smoke out of the cab—when no one was smoking.

Third, Sanchez's hands were shaking considerably when he handed the documents to Cohea. Cohea testified that, based on his experience, the shaking was more than the usual nervousness a driver demonstrates when stopped. When Cohea inspected Sanchez's paperwork, he noticed it was not in order. Sanchez had written the wrong date in his logbook. It appeared that he had been "off" for a couple of days. Cohea testified that at the moment Sanchez handed him the paperwork, he became suspicious that Sanchez was engaged in some criminal activity. When asked if he was "already suspecting [that Sanchez] was carrying dope," Cohea responded: "From when he handed me the driver's license, yes, sir. My indicator is when a person—as soon as I see a hand

10

shaking, my threat levels go up . . . . There is something suspicious."

Fourth, Cohea and Sanchez walked to the rear of the tractor-trailer, in front of the patrol car. When asked questions, Sanchez would not make eye contact with Cohea. Also, despite the cool November weather and the early hour, Cohea noticed sweat running down Sanchez's forehead and cheeks. Cohea also noticed that an artery in Sanchez's neck was visibly pulsating. Cohea then asked Sanchez how much he was being paid for his trip. Sanchez repeated the question to Cohea. Cohea asked Sanchez if there was anything illegal in his truck, and Sanchez then took two steps back from Cohea. Cohea testified about his perceptions of Sanchez's non-verbal cues while in the cab and while behind the tractor-trailer, which is supported by the dashboard camera video.[2] Finally, Cohea testified that Hwy 77 is a known corridor for smuggling drugs and illegal aliens.

Sanchez argues that nervousness alone is not enough to satisfy the "reasonable suspicion" standard. We agree. However, extreme nervousness, coupled with implausible information from the detainee, can raise a reasonable suspicion. *Haas*, 172 S.W.3d at 54. Additionally, while an officer's knowledge that criminal activity is frequent in the area is not, by itself, enough to support a reasonable suspicion, we must consider the totality of the circumstances. *See Goodwin v. State*, 799 S.W.2d 719, 727 (Tex. Crim. App. 1990) (holding officer's "observations of suspicious activity by the occupants of the car before and after the stop, combined with his knowledge of the area and the frequency of burglaries in the neighborhood, and the reasonable inferences to be drawn from the appellant's and his

---

[2] The dashboard camera video was not initially included in the appellate record; however, we requested it and have viewed the video. *See Amador v. State*, 221 S.W.3d 666, 673-74 (Tex. Crim. App. 2007) (requesting photograph displayed to jury to be forwarded to court, even though not included in original record, because it was treated by the court and parties as part of the evidence in the case).

companions' behavior, justified a brief detention of the occupants of the car for further investigation"). An officer's knowledge that the area in which a defendant is apprehended is a "high crime area" is a factor that may be taken into account along with the rest of the circumstances. *See United States v. Arvizu*, 534 U.S. 266, 277 (2002) (holding that under totality of circumstances, reasonable suspicion existed, and considering border patrol agent's knowledge that road traveled by defendant was commonly used by drug smugglers to avoid border patrol); *Goodwin*, 799 S.W.2d at 727; *Valencia v. State*, 820 S.W.2d 397, 400 (Tex. App.–Houston [14th Dist] 1991, pet. ref'd) (considering fact that defendant was "apprehended in a residential neighborhood that was known for its very high crime and its high narcotics trafficking"); *Ortega v. State*, No. 14-97-01084-CR, 1999 WL 717636, at *2 (Tex. App.–Houston [14th Dist.] Sept. 16, 1999, pet. ref'd) (not designated for publication) (holding officer's knowledge that hotel where defendant was apprehended was "a notorious location for illegal narcotics activity").

We do not hold today that extreme nervousness and knowledge that the area is a high crime area,[3] without more, is enough to support a reasonable suspicion. But in this case, there is more. Cohea also observed that Sanchez exhibited erratic behavior and provided an implausible story about why he zipped the curtain. All these facts, considered together, supported Cohea's reasonable suspicion to continue his investigative detention under a new justification.

Furthermore, Cohea's detention of Sanchez for thirty-seven minutes after Cohea completed his initial investigation of the traffic violation, in order to wait for a drug dog to

---

[3] Cohea's testimony that the stretch of Highway 77 between Brownsville and Corpus Christi is a major corridor for illegal activity is a tenuous factor in establishing reasonable suspicion. Courts that have utilized location as a factor, by deeming the location as a "high crime area," have typically pointed to a neighborhood or a road with a more limited geographic scope.

verify that no drugs were contained in the truck's cabin, was not unreasonable. An officer may temporarily detain an automobile after a routine traffic stop if he has a reasonable suspicion that it contains illegal drugs, in order to allow an olfactory inspection by a trained police dog. *Estrada v. State*, 30 S.W.3d 599, 603 (Tex. App.–Austin 2000, pet. ref'd) (citing *Crockett v. State*, 803 S.W.2d 308, 310-11 (Tex. Crim. App. 1991)). In *United States v. Sharpe*, the Supreme Court declined to establish a per se rule that a specific length of time for a *Terry* stop is too long. 470 U.S. 675, 687-88 (1985); *see Kothe v. State,* 152 S.W.3d 54, 64-65 (Tex. Crim. App. 2004). Moreover, the length of the stop is not the end of the inquiry:

> While it is clear that "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion," we have emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes.

*Kothe*, 152 S.W. 3d at 64-65 (citations omitted). "The propriety of the duration of an investigative detention is determined by assessing whether an officer diligently pursued a means of investigation that was likely to dispel or confirm his suspicion quickly." *Josey v. State*, 981 S.W.2d 831, 840 (Tex. App.–Houston [14th Dist.] 1998, pet. ref'd).

In the present case, the trial court found that "[t]aken as a whole, [Cohea] had sufficient information, which based on his experience, and all surrounding circumstances justified a temporary detaining of [Sanchez] while a K-9 unit arrived." Once Cohea developed a reasonable suspicion, he immediately called for the K-9 unit. Cohea did not unreasonably delay in calling for the K-9 unit, and the K-9 unit was required to travel from Refugio. Based on the evidence contained in the record, the thirty-seven minutes from the time Cohea finished his investigation of the traffic violation was not unreasonable. *Id.*

13

(90-minute detention to wait for drug dog reasonable); *see also Strauss*, 121 S.W.3d at 492 (75-minute detention reasonable when officer immediately called for K-9 unit, which was coming from an adjoining county).

Once the trained police dog alerted police that the cab may contain drugs, Cohea had probable cause to search the cab of the truck. "It is well-settled that a trained narcotics dog's positive alert for drugs is sufficient to establish probable cause for an arrest." *$217,590.00 in U.S. Currency v. State*, 54 S.W.3d 918, 923 (Tex. App.–Corpus Christi 2001, no pet.) (citing *De Jesus v. State,* 917 S.W.2d 458, 461 (Tex. App.–Houston [14th Dist.] 1996, pet. ref'd); *Bunts v. State,* 881 S.W.2d 447, 450 (Tex. App.–El Paso 1994, pet. ref'd); *Walsh v. State,* 743 S.W.2d 687, 689 (Tex. App.–Houston [1st Dist.] 1987, pet. ref'd)).

Because Cohea articulated facts supporting his reasonable suspicion of illegal activity, the continued detention was not unreasonable. The subsequent search and arrest was supported by probable cause. Therefore, the trial court did not err in denying appellant's motion to suppress. We overrule Sanchez's sole issue on appeal.

## IV. Conclusion

Having overruled appellant's sole issue on appeal, we affirm.

_____
GINA M. BENAVIDES
Justice

Do not publish.
*See* TEX. R. APP. P. 47.2(b)

Memorandum Opinion delivered and
filed this the 29th day of August, 2008.