

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-10-00364-CR

STEPHANIE BAXTER                                                      APPELLANT

V.

THE STATE OF TEXAS                                                         STATE

----------

### FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

----------

### MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

Following the denial of her motion to suppress, Appellant Stephanie Baxter entered a plea of guilty to the possession of a controlled substance, to-wit: methamphetamine, in an amount of less than one gram.[2]  In three points, Baxter contends that the trial court erred by finding that the arresting officer lawfully

---

[1]*See* Tex. R. App. P. 47.4.

[2] *See* Tex. Health & Safety Code Ann. § 481.115(a) (West 2010)

questioned her during a traffic stop and by failing to suppress the evidence found during that seizure.  We will affirm.

## II. Background

After being arrested on July 3, 2009, during a traffic stop of the vehicle in which she was a passenger, Baxter filed a motion to suppress evidence of methamphetamine and drug paraphernalia found on her person.  At the suppression hearing, Texas Department of Public Safety Trooper Steven Quan testified for the State.  Quan said that he had been trained in various codes and criminal interdiction.  Quan testified that his duties included criminal interdiction and traffic law enforcement.  Quan recalled the early morning of July 3, 2009.  He averred that on that day, he was training a new trooper and doing traffic enforcement.  Quan said that at roughly 1:07 a.m., he was in a marked cruiser sitting stationary on I-35E between Lewisville and Sanger.  As he ran his rear radar, Quan saw two vehicles traveling northbound in the right-hand lane.  Quan said that one of the vehicles "swerved pretty hard to the left lane, and [his] first thought was that that car is trying to hide behind the -- the lead car."  Quan testified that as the vehicle swerved left, it began to overtake the other vehicle.

After confirming that the vehicle was exceeding the speed limit, Quan initiated a traffic stop.  Quan averred, and the video of the stop confirms, that when he initiated the stop, his in-car video recorder initiated and captured the encounter on video.  According to Quan, the vehicle pulled immediately over to the right shoulder and came to a stop.

2

Quan said that he approached the vehicle on the passenger side for safety reasons. Although he could not recall whether the window was initially up or down, he said that he "looked at the driver, told him why he was being stopped, . . . and asked for his [driver] license." Quan testified that the trooper trainee was near him as he approached. Quan said that Baxter was sitting in the front passenger seat, and he identified Baxter in the courtroom. Quan said that as he initiated a conversation with the driver, Baxter began to answer his questions. Quan testified that it is unusual for a passenger to answer his questions and that it struck him as suspicious because he was looking at and directing his questions to the driver of the vehicle. Quan said that he averaged between "80 to 100 . . . traffic stops a week, and through [his] training and experience, most of the time when [he] conduct[ed his] business with the driver, the passengers [remained silent]."

According to Quan, not only did Baxter answer his questions, but her answers were unusually detailed and long. Quan also said that as Baxter answered the questions, he looked at the driver, and that the driver had an "extremely scared look on his face." Because of Baxter's behavior and the driver's appearance, Quan asked Baxter for identification. Baxter stated that she had not renewed her driver license once it had expired. Quan questioned Baxter about whether she had a criminal record, and he specifically asked her, "[W]hen was the last time she [had done] any kind of drugs." By Quan's account, Baxter's answer was vague, so he asked again. Quan said that Baxter's answer

3

changed. Quan testified that based on the unusual manner in which the vehicle swerved and accelerated, the unusually scared look on the driver's face, the manner in which Baxter vaguely answered his questions, and the fact that Baxter did not present any identification, he asked Baxter to step out of the car. Quan said that by that time he believed "that there must have been something else going on in the car and that [he] needed to further investigate it."

As Baxter exited the vehicle and walked toward Quan's cruiser, Quan continued to ask her about drug use "because she gave . . . vague answer[s]." Quan also testified that he believed that based on Baxter's appearance, there was a "drug issue" afoot and that the drug was most likely methamphetamine. Quan said that as he continued to question Baxter about drugs, her answers "changed" multiple times. At first, Baxter said that she had not done drugs in "a long time," but that answer changed to "every once in a while." Quan testified that he told Baxter that he had a hard time believing that she did not use methamphetamine more consistently than that. Eventually, Baxter said that she had used methamphetamine earlier. Quan then asked Baxter if she had any drugs on her. Baxter initially stated that she did not. But after Quan told her that he could have a female officer come and strip search her at a gas station, Baxter "became extremely nervous."

Quan said that based on his training and experience and based on the fact that Baxter had voluntarily offered to let him search the vehicle, he "knew that [drugs were] on her somewhere." Baxter eventually said that she did have drugs

4

on her but that they "didn't belong to her." Baxter said that what she had on her was between her breasts and belonged to the driver. Baxter eventually pulled a pill bottle with two small baggies inside it and a glass pipe from between her breasts, and a black scale from the front of her pants.

Quan then instructed the trainee to have the driver exit the vehicle. After initially denying knowledge of any drugs or drug paraphernalia, the driver said that he had given the drugs to Baxter to discard them out the window but that Baxter chose to hide them on her person instead. The trial court denied Baxter's motion to suppress. This court has reviewed the video from Quan's in-car video recorder, and the video reflects Quan's recollection of events.

After the trial court denied the suppression motion and after Baxter entered a plea of guilty, the trial court sentenced Baxter to two years' deferred adjudication and a $1000 fine. This appeal followed.

### III. DISCUSSION

In three points, Baxter contends that the trial court erred by denying her motion to suppress. The State counters that Quan developed reasonable suspicion that justified his questioning Baxter about her possibly possessing drugs; thus, the trial court did not err by denying Baxter's motion to suppress. The trial court did not make specific findings of facts or conclusions of law following its denial of Baxter's motion.

### A. Standard of Review

5

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial

6

court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *Kelly*, 204 S.W.3d at 818–19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 818.

When the record is silent on the reasons for the trial court's ruling, or when there are no explicit fact findings and neither party timely requested findings and conclusions from the trial court, we imply the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *see Wiede*, 214 S.W.3d at 25. We then review the trial court's legal ruling de novo unless the implied fact findings supported by the record are also dispositive of the legal ruling. *Kelly*, 204 S.W.3d at 819.

We must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case even if the trial court gave the wrong reason for its ruling. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 974 (2004).

When the trial court grants a motion to suppress without filing findings of fact or any other explanation and the only evidence presented in the suppression hearing is the testimony of the arresting officer, there is not a "concrete" set of facts that can be implied from such a ruling. *Ross*, 32 S.W.3d at 856; *Garcia-Cantu*, 253 S.W.3d at 241. In those cases, there is a mixed question of law and fact that turns on an evaluation of the credibility and demeanor of the sole witness whom the trial court obviously chose to believe. *Ross*, 32 S.W.3d at 856; *Guzman*, 955 S.W.2d at 89. In such cases, we view the evidence in the light most favorable to the trial court's ruling, giving it almost total deference. *Ross*, 32 S.W.3d at 856; *see also Garcia-Cantu*, 253 S.W.3d at 241 ("This same highly deferential standard applies regardless of whether the trial court has granted or denied a motion to suppress evidence.").

## B.    Reasonable Suspicion

A police officer may lawfully stop and detain a person for a traffic violation. *Garcia v. State*, 827 S.W.2d 937, 944 (Tex. Crim. App. 1992); *Mohmed v. State*, 977 S.W.2d 624, 628 (Tex. App.—Fort Worth 1998, pet. ref'd). A routine traffic stop resembles an investigative detention. *Berkemer v. McCarty*, 468 U.S. 420, 439–40, 104 S. Ct. 3138, 3149–50 (1984); *State v. Cardenas*, 36 S.W.3d 243, 246 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd). During the detention, the officer may request information concerning the driver license, ownership of the vehicle, the driver's insurance information, the driver's destination, and the purpose of the trip. *Mohmed*, 977 S.W.2d at 628. An officer may also conduct a

8

warrant check to determine whether the driver has any outstanding warrants. *Smith v. State*, 840 S.W.2d 689, 692 (Tex. App.—Fort Worth 1992, pet. ref'd); *Petty v. State*, 696 S.W.2d 635, 639 (Tex. App.—Dallas 1985, no pet.). An officer may even conduct a pat-down search of the driver for weapons and request the driver's consent to search his vehicle. *Florida v. Bostick*, 501 U.S. 429, 435, 111 S. Ct. 2382, 2386 (1991); *Terry v. Ohio*, 392 U.S. 1, 27, 88 S. Ct. 1868, 1883 (1968); *Hunter v. State*, 955 S.W.2d 102, 104 (Tex. Crim. App. 1997). Furthermore, during a valid traffic stop, a police officer has the authority to order a passenger to step out of the car. *Villareal v. State*, 116 S.W.3d 74, 82 (Tex. App.—Houston [14th Dist.] 2001, no pet.); *see also Rhodes v. State*, 945 S.W.2d 115, 117 (Tex. Crim. App.), *cert. denied*, 522 U.S. 894 (1997) (stating that "passengers in an automobile are subject to temporary investigative detentions in the same manner as pedestrians").

An investigative detention must be temporary, and the questioning must last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325 (1983); *Balentine v. State*, 71 S.W.3d 763, 770–71 (Tex. Crim. App. 2002); *Davis v. State*, 947 S.W.2d 240, 245 (Tex. Crim. App. 1997). In determining whether the duration of an investigative detention is reasonable, "common sense and ordinary human experience must govern over rigid criteria." *United States v. Sharpe*, 470 U.S. 675, 685, 105 S. Ct. 1568, 1575 (1985). Once an officer concludes the investigation of the conduct that initiated the stop, continued detention of a

9

person is permitted for the purpose of issuing a citation. *Kothe v. State*, 152 S.W.3d 54, 65 n.43 (Tex. Crim. App. 2004) (*citing with approval United States v. Wellman*, 185 F.3d 651, 656 (6th Cir. 1999)), which holds that prolonging a detention for the purpose of issuing the citation is "well within the bounds of the initial stop"); *see Coleman v. State*, 188 S.W.3d 708, 719 (Tex. App.—Tyler 2005, pet. ref'd) (holding that purpose of stop was complete upon the issuance of the citation), *cert. denied*, 549 U.S. 999 (2006). A detention may also be prolonged beyond the point when the purpose of the initial stop is complete if there is reasonable suspicion to believe another offense has been or is being committed. *United States v. Brigham*, 382 F.3d 500, 510–11 (5th Cir. 2004); *Davis*, 947 S.W.2d at 245; *McQuarters v. State*, 58 S.W.3d 250, 256 (Tex. App.—Fort Worth 2001, pet. ref'd).

"Reasonable suspicion" exists if an officer has specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that a particular person has engaged or is—or soon will be— engaging in criminal activity. *Terry*, 392 U.S. at 21, 88 S. Ct. at 1880; *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001); *McQuarters*, 58 S.W.3d at 255. The officer must be able to articulate more than an "inchoate and unparticularized suspicion or 'hunch'" of criminal activity. *Illinois v. Wardlow*, 528 U.S. 119, 123–24, 120 S. Ct. 673, 676 (2000). The circumstances that raise suspicion that illegal conduct is taking place need not be criminal in themselves; however, the suspicious conduct relied upon by an officer must be sufficiently

10

distinguishable from that of innocent people under the same circumstance to clearly, if not conclusively, set the suspect apart from them. *Davis*, 947 S.W.2d at 242; *Crockett v. State*, 803 S.W.2d 308, 311 (Tex. Crim. App. 1991).

The existence of reasonable suspicion is determined by considering the totality of the circumstances. *Garcia*, 43 S.W.3d at 530; *McQuarters*, 58 S.W.3d at 255. Increasing or extreme nervousness and conflicting or implausible information can, along with other factors, raise a reasonable suspicion of criminal activity so as to prolong a traffic stop. *Haas v. State*, 172 S.W.3d 42, 53 (Tex. App.—Waco 2005, pet. ref'd); *see also Veal v. State*, 28 S.W.3d 832, 837 (Tex. App. —Beaumont 2000, pet. ref'd) ("Extreme nervousness has traditionally been a fact that law enforcement has used in its list of elements leading up to either reasonable suspicion or probable cause."). But nervousness alone is not sufficient to be a factor giving rise to reasonable suspicion. *LeBlanc v. State*, 138 S.W.3d 603, 608 n.6 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

In this case, after initiating a lawful traffic stop, Quan approached the passenger side of the car and began to explain to the driver why he had been stopped and ask where he was traveling to and from. Quan testified, and the video confirms, that at that moment Baxter began to answer his questions in great detail while the driver remained silent. According to Quan, at that time the driver had an extremely scared look on his face. Quan then asked Baxter about her identification. Baxter did not have any type of identification. Quan then inquired whether Baxter had a previous criminal record. When Quan asked

11

Baxter whether she had ever been convicted of drug possession, Baxter answered, "no." But when Quan asked whether Baxter used drugs, Baxter first said "no" but then immediately revised her answer to not "in a long time."

According to Quan, based on the manner in which the car initially swerved and accelerated, the driver's extreme nervousness, Baxter's unusual manner in which she tried to "take over the traffic stop" and control the conversation that he had initiated with the driver, and Baxter's vague answers to his question directed at her, he believed that at that time he needed to investigate further. He asked Baxter to step out of the car, and he continued to question her about drug use. We conclude that at this point during the encounter, Quan possessed specific articulable facts that, when combined with rational inferences from those facts, led him to believe that Baxter or the driver was engaged in criminal activity. *See Haas*, 172 S.W.3d at 53–54 (holding that defendant's increased nervousness, volunteering a lot of information, and information that the officer found implausible and inconsistent gave officer reasonable suspicion to continue to investigate whether defendant was engaged in criminal activity).

After exiting the vehicle, Quan continued to question Baxter. Baxter's answers rapidly and repeatedly changed until eventually she admitted to having used drugs "earlier" from one of the baggies found on her. Quan said that this indicated the need to further question Baxter about drugs possibly being on her person or in the vehicle. *See Stone v. State*, 147 S.W.3d 657, 661 (Tex. App.— Amarillo 2004, pet. ref'd) (concluding that passenger's admission to

12

methamphetamine use three days prior to traffic stop relevant factor in officer forming probable cause to search person and vehicle).  Again, Quan's questions were met with vague and changing answers.  Within minutes of the initial traffic stop, Baxter admitted that she had drugs on her person but that they were not hers and that they belonged to the driver.  Viewing the evidence in the light most favorable to the trial court's ruling, and looking at the totality of circumstances while giving almost total deference to that ruling, we conclude that the trial court did not abuse its discretion by denying Baxter's motion to suppress.  *Garcia-Cantu*, 253 S.W.3d at 241*; see Haas*, 172 S.W.3d at 53 (holding that officer who initially stopped defendant for traffic violation had reasonable suspicion to prolong defendant's detention so that officer could conduct a canine sniff on defendant's car when defendant displayed increasing nervousness, volunteered a lot of information, and provided implausible and inconsistent answers to officer's questions).  We overrule Baxter's three points.

## IV. CONCLUSION

Having overruled Baxter's three points, we affirm the trial court's orders.


BILL MEIER
JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  August 31, 2011

14