# NO. 12-21-00139-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *JUSTIN ALLEN HAMMONTREE,* *APPELLANT* | § | *APPEAL FROM THE 7TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,* *APPELLEE* | § | *SMITH COUNTY, TEXAS* |

### *MEMORANDUM OPINION*

Justin Allen Hammontree appeals his conviction for possession of between two hundred and four hundred grams of methamphetamine with intent to deliver. Appellant raises five issues on appeal. We modify and affirm as modified.

## BACKGROUND

On October 23, 2019, Appellant was stopped for the traffic offense of driving with an expired registration. The officer requested to search Appellant's vehicle, and Appellant repeatedly equivocated on whether he would consent. Ultimately, the officer requested a K-9 Unit. When the K-9 Unit arrived, the K-9 officer's drug dog alerted on Appellant's vehicle. Officers searched the vehicle and discovered, among other things, nearly 350 grams of methamphetamine.

Appellant was charged by indictment with possession of between two hundred and four hundred grams of methamphetamine with intent to deliver and pleaded "not guilty." The indictment further alleged that Appellant previously had been convicted of a felony. Appellant later filed a motion to suppress, in which he argued that the arresting officer lacked reasonable suspicion to initiate the traffic stop, the officer caused the detention to last longer than necessary to accomplish the purpose of the stop, and, as a result, the contraband discovered during the ensuing search of his vehicle should be suppressed. The trial court overruled Appellant's motion.

1

The matter proceeded to a jury trial, following which the jury found Appellant "guilty" as charged. The matter proceeded to a trial on punishment, and the jury ultimately assessed Appellant's punishment at imprisonment for twenty-five years. The trial court sentenced Appellant accordingly, and this appeal followed.

## MOTION TO SUPPRESS

In his first issue, Appellant argues that the trial court abused its discretion by overruling his motion to suppress. Specifically, he contends that the officer lacked reasonable suspicion to initiate the traffic stop, the officer caused the detention to last longer than necessary to accomplish the purpose of the stop, and, as a result, the contraband discovered during the ensuing search of his vehicle should be suppressed.

**Standard of Review**

We review a trial court's ruling on a motion to suppress under a bifurcated standard. *Hubert v. State*, 312 S.W.3d 554, 559 (Tex. Crim. App. 2010); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). A trial court's decision to grant or deny a motion to suppress is generally reviewed under an abuse of discretion standard. *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010); *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008). We give almost total deference to a trial court's determination of historical facts, especially if those determinations turn on witness credibility or demeanor and review de novo the trial court's application of the law to facts not based on an evaluation of credibility and demeanor. *Neal v. State*, 256 S.W.3d 264, 281 (Tex. Crim. App. 2008). At a suppression hearing, a trial court is the exclusive trier of fact and judge of the witnesses' credibility. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). Accordingly, a trial court may choose to believe or to disbelieve all or any part of a witness's testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). However, a trial court has no discretion in determining what the law is or applying the law to the facts. *State v. Kurtz*, 152 S.W.3d 72, 81 (Tex. Crim. App. 2004). Thus, a failure by a trial court to analyze or apply the law correctly constitutes an abuse of discretion. *Id.*

**Governing Law**

A routine traffic stop closely resembles an investigative detention. *Powell v. State*, 5 S.W.3d 369, 375 (Tex. App.–Texarkana 1999, pet. ref'd); *see also United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004). Because an investigative detention is a seizure that implicates the

2

United States and Texas Constitutions, the traffic stop must be reasonable. U.S. CONST. amend. IV; TEX. CONST. art. I, § 9; *Johnson v. State*, 365 S.W.3d 484, 488 (Tex. App.–Tyler 2012, no pet.). When evaluating the reasonableness of an investigative detention, we conduct the inquiry set forth by the United States Supreme Court in *Terry v. Ohio* to determine whether (1) the officer's action was justified at its inception; and (2) it was reasonably related in scope to the circumstances that initially justified the interference. *See Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S. Ct. 1868, 1879, 20 L. Ed. 2d 889 (1968); *Davis v. State*, 947 S.W.2d 240, 242 (Tex. Crim. App. 1997).

Under the first part of the inquiry, an officer's reasonable suspicion justifies an investigative detention. *Davis*, 947 S.W.2d at 242–43. Specifically, the officer must have a reasonable suspicion that some activity out of the ordinary is occurring or has occurred. *Id.* at 244. An officer has "reasonable suspicion to detain a person if he has specific, articulable facts that, combined with rational inferences from those facts, would lead him reasonably to conclude that the person detained is, has been, or soon will be engaged in criminal activity." *State v. Elias*, 339 S.W.3d 667, 674 (Tex. Crim. App. 2011). This is an objective standard. *Id.* Thus, when an officer has a reasonable basis for suspecting that a person has committed an offense, the officer may legally initiate an investigative stop. *See Powell*, 5 S.W.3d at 376 (citing *Drago v. State*, 553 S.W.2d 375, 377–78 (Tex. Crim. App. 1977)).

Under the second part of the inquiry, the "investigative stop can last no longer than necessary to effect the purpose of the stop." *Kothe v. State*, 152 S.W.3d 54, 63 (Tex. Crim. App. 2004). The issue is "'whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'" *Id.* at 64 (quoting *United States v. Sharpe*, 470 U.S. 675, 685–86, 105 S. Ct. 1568, 1575, 84 L. Ed. 2d 605 (1985)). With regard to a traffic stop, an officer can conduct a license and warrants check. *Id.* at 63; *see also Rodriguez v. United States*, 575 U.S. 348, 354–55, 135 S. Ct. 1609, 1615, 191 L. Ed. 2d 492 (2015). An officer can check for outstanding warrants against the driver and can conduct other tasks that have the objective of "ensuring that vehicles on the road are operated safely and responsibly." *Rodriguez*, 575 U.S. at 355, 135 S. Ct. at 1615. An officer also may ask the driver to exit the vehicle. *See Strauss v. State*, 121 S.W.3d 486, 491 (Tex. App.–Amarillo 2003, pet. ref'd).

3

An investigative stop that continues longer than necessary to complete the purpose of the stop is permitted if additional facts provide a reasonable suspicion of another crime or possible crime. *Green v. State*, 256 S.W.3d 456, 462 (Tex. App.–Waco 2008, no pet.). If a valid traffic stop evolves into an investigative detention for a drug related offense so that a canine sniff can take place, reasonable suspicion is necessary to prolong the detention. *Id.*; *see also Rodriguez*, 575 U.S. at 349, 135 S. Ct. at 1614 (authority for detention of person for traffic violation ends when tasks tied to the traffic infraction are or reasonably should have been completed). We examine the totality of the circumstances to determine the reasonableness of a temporary detention. *Curtis v. State*, 238 S.W.3d 376, 380–81 (Tex. Crim. App. 2007).

An officer may request consent to search a vehicle, even after the purpose of the traffic stop has been accomplished, as long as the request is reasonable under the circumstances and the officer has not conveyed a message that compliance with the officer's request is required. *Haas v. State*, 172 S.W.3d 42, 52 (Tex. App.–Waco 2005, pet. ref'd); *Leach v. State*, 35 S.W.3d 232, 235–36 (Tex. App.–Austin 2000, no pet.); *Simpson v. State*, 29 S.W.3d 324, 328 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd). But if consent is refused, the officer must have reasonable suspicion to continue to detain the person stopped. *Haas*, 172 S.W.3d at 52.

While reasonable suspicion allows an officer to temporarily detain someone, the officer must act to confirm or dispel his suspicions quickly. *See Matthews v. State*, 431 S.W.3d 596, 603 (Tex. Crim. App. 2014). One method of confirming or dispelling reasonable suspicion that an individual has committed a drug-related offense is to have a trained K–9 unit perform an "open air" search of the vehicle. *Id.* If the drug dog alerts, the presence of drugs is confirmed, and the officer may conduct a warrantless search. *See id.* at 603–04. If the drug dog does not alert, generally, the temporary detention ceases. *Id.* at 604.

**The Evidence**[1]

---

[1] We would be remiss were we not to note that Appellant wholly failed to cite to the record in his briefing of his fact-intensive first issue, apart from a broad citation to the more than one hundred pages comprising the hearing on his motion to suppress in his "Statement of the Case." *See* TEX. R. APP. P. 38.1 ("Argument. The brief must contain a clear and concise argument for the contentions made, <u>with appropriate citations</u> to authorities and <u>to the record</u>") (emphasis added). An appellant waives an issue on appeal if he does not adequately brief that issue by not providing supporting arguments, substantive analysis, and appropriate citations to authorities and to the record. *Chaves v. State*, 630 S.W.3d 541, 555 (Tex. App.–Houston [1st Dist.] 2021, no pet.) (citing *Lucio v. State*, 351 S.W.3d 878, 896–97 (Tex. Crim. App. 2011); *Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008); *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000) (defendant inadequately briefed complaint where he neglected to present argument

In the instant case, the trial court heard testimony from Smith County Sheriff's Deputy David Hickey pertaining to the events relevant to Appellant's motion. The State also admitted into evidence a video taken of the encounter by Hickey's body camera. During his testimony, Hickey recounted that on October 15, 2020, he assisted Whitehouse Police Department Officer Michael Osorio in a traffic stop for Appellant's driving with an expired registration, wherein Appellant also was found to be in possession of a firearm and a small amount of marijuana.

Hickey testified that on the night of October 23, 2019, he observed a vehicle traveling westbound on Loop 49 in Tyler, Texas. Hickey "ran the plates" and learned that the vehicle registration was expired. As a result, Hickey initiated a traffic stop on the vehicle and its driver, who he quickly recognized as Appellant from the October 15 encounter. Hickey stated that Appellant almost immediately began behaving nervously and rummaging around in his vehicle. Hickey also noticed that Appellant's carotid artery was pulsating, which in his experience, he equated with excessive nervousness. Hickey noted that this level of nervousness was not something he typically saw during a routine traffic stop, and he began to suspect the possibility that additional criminal activity was afoot. As a result, and based on his prior encounter with Appellant, which involved the discovery of a firearm in the vehicle, Hickey asked Appellant to exit the vehicle and performed a pat-down frisk on Appellant in the interest of safety.

Afterward, Hickey asked Appellant to step to the rear of the vehicle and away from the roadway. Once there, Appellant asked Hickey a question about his prior arrest arising from the October 15 incident, and Hickey succinctly answered Appellant's question. This exchange lasted approximately one minute, at which point Hickey asked Appellant if he had anything in the vehicle. When Appellant stated he did not, Hickey asked him if he would permit Hickey to search the vehicle. In response, Appellant stated that he felt "picked on," and Hickey sought briefly to reassure Appellant that his beliefs in this regard were unfounded. This exchange continued for approximately thirty-eight seconds and ended when Hickey again asked if Appellant would permit

---

with citation to appropriate authority)); *see also **Ray v. State***, 176 S.W.3d 544, 553 n.7 (Tex. App.–Houston [1st Dist.] 2004, pet. ref'd).

As the Texas Court of Criminal Appeals has emphasized, an appellate court has no obligation to construct and compose issues, facts, and arguments with appropriate citations to authorities and the record for the appellant. *See **Wolfe v. State***, 509 S.W.3d 325, 343 (Tex. Crim. App. 2017); ***Busby***, 253 S.W.3d at 673. A brief that fails to apply the law to the facts does not comply with Texas Rule of Appellate Procedure 38.1 and presents nothing for our review. *See **Swearingen v. State***, 101 S.W.3d 89, 100 (Tex. Crim. App. 2003). But despite Appellant's waiver of his first issue, we will consider it in the interest of justice.

him to search the vehicle. In response, Appellant embarked on a rambling soliloquy about his church, his Sunday school teacher, "Bobby," his wife's concern for his safety, which resulting in her taking the children away for several days, only to return earlier that day, and an incident involving Whitehouse police officers' coming to his house. While Hickey did not remain unresponsive to Appellant's palaver, his responses did little more than punctuate Appellant's varied statements, which further included advice he received from Bobby that you never should let police search your car and, particularly, when you purchase a used car, "you don't know." Approximately one minute, thirty-three seconds later, Appellant concluded his musings by mentioning to Hickey that he had unopened beers in the front seat.

Hickey then reiterated to Appellant that it was his choice whether to consent to a search. In response, Appellant asked for the first time if he could call Bobby. Hickey responded briefly that he could not make a phone call for safety reasons and mentioned to Appellant that as an alternative to his consenting to a search, Hickey could call for a dog to perform an open-air search around the vehicle. Appellant then began a somewhat protracted expression of equivocation, wherein he spoke about his rights, as well as about how the problem with his having possessed a firearm on the occasion of his last encounter with law enforcement was not his status as a felon, but rather, due to the fact that marijuana was in the vehicle. Hickey briefly interjected, asking if there was marijuana in the vehicle currently. Appellant responded that he was unsure if there might be residue. He then stated that he was "so nervous" and again asked if he could call Bobby. Hickey repeated his explanation that he would not allow Appellant to call anyone due to safety concerns. Appellant concluded this one minute, forty-eight second portion of the exchange, stating that he had all of his workers in his truck that day.

Hickey attempted to redirect the conversation again, telling Appellant that he did not have to consent and if he chose not to do so, Hickey could "call for a dog." In response, Appellant embarked on yet another extended oration, in which he stated generally that he felt like he needed advice and he was "scared for a lot of reasons." Appellant then stated that he felt like something was going on that the police were not telling him. When Hickey asked Appellant what he meant by this, Appellant explained that he found a device in his hunter's pouch that appeared to be some sort of G.P.S. tracker and when he researched the model number, he discovered that it emitted a high frequency that only dogs can hear. After this one-minute exchange, Appellant told Hickey that he would love to call an attorney, a preacher, or someone. Hickey responded, "Since you said

6

that, let's just get the dog." But as Hickey attempted to return to his vehicle, Appellant engaged him again for an additional one minute, forty-five seconds, asking if he could make a phone call. When Hickey yet again told him he could not, Appellant asked if he could retrieve his phone from his truck. Hickey declined Appellant permission to re-enter his vehicle and returned to his patrol vehicle where he arranged for the nearest K-9 unit to be sent to their location to perform an open-air search around Appellant's truck.

## Initial Traffic Stop

Appellant first argues that the trial court abused its discretion by denying his motion to suppress because the State did not introduce sufficient evidence that Appellant committed a traffic offense because the arresting officer lacked an objective basis to initiate the traffic stop. In making this argument, Appellant patently ignores Hickey's testimony that on the night of October 23, 2019, he observed a vehicle traveling westbound on Loop 49, "ran the plates," learned that the vehicle registration was expired, and as a result, initiated a traffic stop on the vehicle and its driver. *See* TEX. TRANSP. CODE ANN. §§ 502.040(a) (West Supp. 2021) 502.045 (West 2013); *Nunez v. State*, No. 08-09-00047-CR, 2011 WL 809966, at *3 (Tex. App.–El Paso Mar. 9, 2011, no pet.) (mem. op., not designated for publication) ("It is a traffic violation in Texas to operate a motor vehicle that has not been registered as required by law"). Thus, we conclude that Appellant's argument that "the State failed to offer sufficient evidence before the trial court that [Appellant] committed a traffic violation" is wholly unfounded based on the record before us.[2]

## Length of Detention and Reasonable Suspicion

Appellant next argues that the trial court abused its discretion by denying his motion to suppress because Hickey unconstitutionally prolonged Appellant's detention. Based on our review of Hickey's testimony and our careful consideration of the video evidence, we disagree. As set forth above, Hickey quickly recognized Appellant from the October 15 encounter, during which marijuana and firearms were discovered in his vehicle. *See Hamal v. State*, 390 S.W.3d 302, 308 (Tex. Crim. App. 2012) (prior criminal record does not, by itself, establish reasonable suspicion but is factor that may be considered, as is a recent drug arrest). Hickey also testified that he noticed that Appellant, almost immediately, began behaving in an unusually nervous manner and

---

[2] *See* TEX. RULES DISCIPLINARY P. R. 3.01, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A (West 2019) ("A lawyer shall not bring . . . a proceeding or assert . . . an issue therein, unless the lawyer reasonably believes that there is a basis for doing so that is not frivolous").

rummaging around in his vehicle. *See id.* ("Although nervousness alone is not sufficient to establish reasonable suspicion for an investigative detention, it can do so in combination with other factors").

Once he and Appellant were in a safe area away from the highway, Hickey asked for permission to search Appellant's vehicle, and Appellant began to speak with Hickey on myriad topics and equivocated at length about whether he should or would give consent to search. During this time, Appellant stated that there might be marijuana residue in the vehicle and made other statements, which Hickey reasonably could construe as Appellant's preparing excuses for any contraband that might be discovered during an ensuing search. These statements include the advice purportedly given to him by his friend, Bobby, about when you buy a used car, "you don't know," as well as his statement about all of his workers' having been in the vehicle that day. Moreover, Appellant stated to Hickey that he was "scared for a lot of reasons," he felt like something was going on that the police were not telling him, and he found a device in his hunter's pouch that appeared to be some sort of G.P.S. tracker, which, after conducting research, he discovered emitted a high frequency that only dogs can hear. Hickey testified that the implausibility of this story caused him to be even more suspicious that Appellant could be secreting contraband in the vehicle. Lastly, Appellant repeatedly asked to phone his friend, Bobby, and, ultimately, asked to retrieve his phone from the vehicle when Hickey sought to return to his patrol vehicle to request a K-9 unit. Hickey testified that this caused him to become further suspicious that Appellant was engaged in criminal activity and that Appellant possibly wanted to re-enter his vehicle to retrieve substances or a firearm.

Based on Hickey's prior, recent encounter with Appellant wherein he discovered marijuana and a firearm in Appellant's vehicle, his observations of Appellant's nervous and unusual behavior and statements, Appellant's changing story about whether there was anything of note in the vehicle versus whether there was potential marijuana residue in the vehicle, Appellant's appearing to prepare excuses for anything that might be found in the vehicle, and Appellant's attempt to obtain permission to re-enter the vehicle before the dog arrived to perform an open-air search, we conclude that there was ample evidence upon which Hickey could rely in developing reasonable suspicion that Appellant might have illegal drugs in the vehicle. Accordingly, based on the totality of the circumstances, Appellant's continued detention while Hickey waited for the K-9 unit was justified. *See Green*, 256 S.W.3d at 462.

8

Appellant argues, however, that Hickey unnecessarily prolonged the detention, given the typical time required to conclude an investigation for an expired vehicle registration and that he did so in an attempt to conduct a "fishing expedition" to discover unrelated criminal activity. In so doing, Appellant points out that nearly ten minutes elapsed between Hickey's making initial contact with him and Hickey's returning to his patrol vehicle. However, based on our review of the video evidence in this case, we cannot conclude that Hickey unnecessarily prolonged the detention.

The time elapsed from Hickey's initial contact with Appellant, including Appellant's exiting the vehicle and Hickey's performing a pat-down search, to Hickey's escorting Appellant to a safe area behind his vehicle away from the roadway was approximately two minutes, fourteen seconds. Once there, Appellant asked Hickey a question about his prior arrest from the October 15 incident, and Hickey succinctly answered Appellant's question. This exchange lasted approximately one minute. After Hickey first requested to search Appellant's vehicle, Appellant stated that he felt "picked on," and Hickey sought briefly to reassure Appellant. This exchange continued for approximately thirty-eight seconds and ended when Hickey again asked if Appellant would permit him to search the vehicle. In response, Appellant embarked on the aforementioned, rambling soliloquy, which lasted one minute, thirty-three seconds. Hickey again sought to redirect the conversation by reiterating to Appellant that it was his choice whether to consent to a search. In response, Appellant asked to call his friend, Bobby. Hickey declined to let Appellant do so and mentioned that, alternatively, he could call for a dog to perform an open-air search around the vehicle, at which point Appellant then began a somewhat protracted expression of equivocation about giving consent to search that lasted one minute, forty-eight seconds. Hickey again attempted to redirect the conversation, telling Appellant that he did not have to consent and if he chose not to do so, Hickey could "call for a dog." In response, Appellant embarked on yet another extended oration that lasted one minute. Thereafter, Hickey informed Appellant that he would be calling for a dog to perform a search, but before he could return to his patrol vehicle, Appellant launched into another drawn-out statement about phoning friends and retrieving his phone, which lasted an additional one minute, forty-five seconds.

In short, Appellant sought to engage Hickey in conversation repeatedly; he simply would not stop talking. In total, the several, rather one-sided exchanges Appellant initiated from the time he and Hickey were standing behind his vehicle lasted approximately seven minutes, forty-four

9

seconds. And though we note that Hickey participated in these exchanges, suffice it to say that Appellant did most of the talking and Hickey continually sought to redirect the matter to the subject of Appellant's consent to search. Thus, based on the video evidence, we conclude that Appellant, not Hickey, unnecessarily prolonged the detention.

**Additional Time Waiting for K-9 Unit**

Once Hickey called for the K-9 unit, an additional twenty-four minutes elapsed before the drug dog performed an open-air search and alerted on Appellant's vehicle. Appellant makes no specific argument in his brief that this extended period of detention was a violation of his constitutional rights. Nonetheless, at the hearing on Appellant's motion, Hickey testified that on the night in question, all of his department's K-9 units were in training, so he, through a fellow officer, requested a K-9 unit from a nearby department, which he stated was the closest available unit. Based on our consideration of Hickey's testimony that "he made every effort to get that K-9 as fast as he could" and the overall level of evidence supporting reasonable suspicion as set forth above, we conclude that the additional twenty-four-minute wait for the K-9 unit's arrival was within constitutional limits. *See, e.g.*, ***Parker v. State***, 297 S.W.3d 803, 812 (Tex. App.–Eastland 2009, pet. ref'd) (officers acted diligently to confirm or dispel reasonable suspicion though the drug dog took forty minutes to arrive after being requested); ***Willis v. State***, 192 S.W.3d 585, 589–90, 592 (Tex. App.–Tyler 2006, no pet.) (length of detention not unreasonable when K-9 unit arrived twenty-nine minutes after it initially was called); ***Strauss v. State***, 121 S.W.3d 486, 491 (Tex. App.–Amarillo 2003, pet. ref'd) (detention not unreasonable even though seventy-five minutes expired before drug dog arrived at scene).

**Summation**

In sum, Appellant's initial detention for driving with an expired vehicle registration was warranted. Hickey did not unreasonably extend the length of Appellant's detention and had ample evidence to support his reasonable suspicion that Appellant might have illegal drugs in the vehicle. And, lastly, the additional twenty-four minutes that elapsed once Hickey requested a K-9 unit was within constitutional limits. Appellant's first issue is overruled.

### EVIDENTIARY SUFFICIENCY

In his second issue, Appellant argues that the evidence is insufficient to support the trial court's judgment. Specifically, he contends that there is insufficient evidence to support that he possessed the methamphetamine at issue with intent to deliver.

**Standard of Review and Governing Law**

The *Jackson v. Virginia*[3] legal sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the state is required to prove beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). Legal sufficiency is the constitutional minimum required by the Due Process Clause of the Fourteenth Amendment to sustain a criminal conviction. *See Jackson*, 443 U.S. at 315–16, 99 S. Ct. at 2786–87; *see also Escobedo v. State*, 6 S.W.3d 1, 6 (Tex. App.–San Antonio 1999, pet. ref'd). The standard for reviewing a legal sufficiency challenge is whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 320, 99 S. Ct. at 2789; *see also Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). The evidence is examined in the light most favorable to the verdict. *See Jackson*, 443 U.S. at 320, 99 S. Ct. at 2789; *Johnson*, 871 S.W.2d at 186. A jury is free to believe all or any part of a witness's testimony or disbelieve all or any part of that testimony. *See Lee v. State*, 176 S.W.3d 452, 458 (Tex. App.–Houston [1st Dist.] 2004), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006). A successful legal sufficiency challenge will result in rendition of an acquittal by the reviewing court. *See Tibbs v. Florida*, 457 U.S. 31, 41–42, 102 S. Ct. 2211, 2217–18, 72 L. Ed. 2d 652 (1982).

Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Rodriguez v. State*, 521 S.W.3d 822, 827 (Tex. App.–Houston [1st Dist.] 2017, no pet.) (citing *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011)). Each fact need not point directly and independently to the guilt of the appellant, provided that the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Juries are permitted to draw multiple reasonable inferences so long as each inference is supported by the evidence presented at trial. *Id.* at 15. Juries are not permitted to reach conclusions based on mere speculation or factually unsupported inferences or presumptions. *Id.* An inference is a conclusion reached by considering other facts and deducing a logical consequence from them, while

---

[3] 443 U.S. 307, 315–16, 99 S. Ct. 2781, 2786–87, 61 L. Ed. 2d 560 (1979).

speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. *Id.* at 16.

The sufficiency of the evidence is measured against the offense as defined by a hypothetically correct jury charge. *See Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge would include one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant is tried." *Id.*

To support Appellant's conviction for possession of methamphetamine with intent to deliver, the State was required to prove that he (1) exercised control, management, or care over the substance and (2) knew the matter possessed was contraband. *See Poindexter v. State*, 153 S.W.3d 402, 405 (Tex. Crim. App. 2005), *overruled on other grounds by Robinson v. State*, 466 S.W.3d 166, 173 & n.32 (Tex. Crim. App. 2015); *see also* TEX. HEALTH & SAFETY CODE ANN. §§ 481.102(6) (West Supp. 2021), 481.112(a) (West 2017). A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that circumstances exist. TEX. PENAL CODE ANN. § 6.03(b) (West 2021). The State must establish, to the requisite level of confidence, that the accused's connection with the drug was more than just fortuitous. *Poindexter*, 153 S.W.3d at 406. When the accused is not in exclusive possession of the place where the substance is found, we cannot conclude that he had knowledge of and control over the contraband unless there are additional independent facts and circumstances which link the accused to the contraband. *Id.* Links that may circumstantially establish the sufficiency of the evidence to prove that a defendant had knowing "possession" of contraband include the following: (1) the defendant's presence when a search is conducted; (2) whether the contraband was in plain view; (3) the defendant's proximity to and the accessibility of the narcotic; (4) whether the defendant was under the influence of narcotics when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the drugs were found; (12) whether the place where the drugs were found was enclosed; (13) whether the defendant was

12

found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt. *See Evans v. State*, 202 S.W.3d 158, 162 n.12 (Tex. Crim. App. 2006). It is not the number of links that is dispositive, but rather the logical force of all of the evidence, both direct and circumstantial. *Id.* Ultimately, the question of whether the evidence is sufficient to link the appellant to the contraband must be answered on a case-by-case basis. *See Whitworth v. State*, 808 S.W.2d 566, 569 (Tex. App.–Austin 1991, pet. ref'd).

Furthermore, the intent to deliver may be proved by circumstantial evidence, including evidence surrounding its possession. *Rhodes v. State*, 913 S.W.2d 242, 251(Tex. App.–Fort Worth 1995), *aff'd*, 945 S.W.2d 115 (Tex. Crim. App. 1997). Among the factors to be considered in deciding whether a defendant possessed drugs with an intent to deliver include the nature of the location where he was arrested, the quantity of drugs possessed, the manner of packaging the drugs, the presence or absence of drug paraphernalia, whether he possessed a large amount of cash, and his status as a drug user. *Kibble v. State*, 340 S.W.3d 14, 18–19 (Tex. App.–Houston [1st Dist.] 2010, pet. ref'd). This list of factors is not exclusive, nor are they all required to be present in order to establish an intent to deliver. *Id.* at 19.

**The Evidence**[4]

At the trial of the instant case, Hickey testified about the October 23, 2019 traffic stop of Appellant for an expired vehicle registration. He identified Appellant as the operator and sole occupant of the vehicle, which was registered, albeit expired, in his name. Hickey's body camera video of the stop was admitted into evidence and played for the jury. Hickey testified that he first noticed that Appellant was "very talkative" and nervous. He noted that Appellant's nervousness increased over the course of the encounter and that his carotid artery pulsated noticeably. In the video, the jury could observe how Appellant volunteered information about his background, his Sunday school, and his family. The jury further could observe that when Hickey asked for consent to search the vehicle, Appellant was evasive in answering that question and, instead, engaged in longwinded pontification on the subject and repeatedly asked to phone a friend and to get back into the truck to retrieve his phone. In the video, Appellant expressed his concern that Hickey might find "marijuana residue" in the vehicle and mentioned that all of his workers had been in his truck that day, implying that his workers may have left something illegal in the truck. The jury

---

[4] *See* n.1. Appellant again wholly fails to cite to the record in his briefing of his fact-intensive second issue. But despite Appellant's waiver of his second issue, we will consider it in the interest of justice.

13

also observed Appellant suggest that he previously found some sort of G.P.S. tracker that emitted signals that only dogs could hear, which Deputy Hickey took as Appellant's "trying to explain why a dog might alert on th[e] vehicle." Once Hickey decided to call for a K-9 unit to bring a drug dog to the scene, Appellant continued to ask to be let back into his vehicle. The jury also observed in the video Appellant's discussing his October 15 traffic stop, which resulted in his arrest for possession of a firearm and marijuana. Additionally, the jury observed in the video that Appellant continually mentioned a person named "Wesley," who he identified as the person whose marijuana was discovered in his previous, recent encounter with law enforcement.

The jury also observed the body camera video depicting the drug dog's alerting on Appellant's vehicle and the discovery of a syringe, as well as a backpack with Appellant's name on it, which contained a bank statement in Appellant's name, two of his medicine bottles, and a large plastic bag containing a crystal-like substance, which a field test later presumptively determined to be methamphetamine. Hickey testified that he never had seen this much methamphetamine in any of the stops or arrests he made during his nine years in law enforcement. The jury also observed on the video that officers discovered a "lock box" in Appellant's vehicle, which contained another large plastic bag of methamphetamine, a scale, several needles and spoons, and several small, empty plastic baggies. Another smaller baggy containing a substance later determined to be methamphetamine was found in this box, along with two checkbooks in the names of "All Things Paving" and "Justin Hammontree." Hickey stated that he found six hundred dollars in cash during the search of the vehicle, and in his training and experience, the large amount of methamphetamine found, when considered with the scales and baggies, was more consistent with "somebody who's dealing" than with an ordinary "user."

Department of Public Safety Forensic Scientist Micaela Stewart testified that she weighed and tested the substance found in Appellant's truck. She stated that the substance was methamphetamine with a combined weight of approximately 344 grams.

Osorio testified that he stopped Appellant on October 15, 2019, for an expired vehicle registration, which ultimately resulted in Appellant's arrest for possession of marijuana and unlawful carrying of a weapon. At the traffic stop in this case, Osorio helped Hickey inventory Appellant's vehicle. He testified that just one of the big bags of drugs seized from Appellant "was the most methamphetamine I've ever seen" at that time or since the time of Appellant's arrest. Osario further testified that based on his training and experience, the evidence was "more

14

consistent with somebody who's dealing" and "selling narcotics." On cross examination, Osorio stated that he received a tip that Appellant was transporting drugs. He further stated that it was common knowledge among local law enforcement officers that Appellant was "hauling drugs."

Former Whitehouse Police Department Sergeant Debra Daily testified that she was a patrol sergeant and K-9 handler and responded to the scene with her drug dog, Fido, to perform an open-air search around Appellant's vehicle. She further testified that she assisted in the search of Appellant's vehicle and that she never had come across that much methamphetamine in her eight years of narcotics enforcement experience. She stated that when someone possesses that much methamphetamine, particularly in conjunction with possession of a scale, syringes, and smaller baggies, it is consistent with someone who is "delivering or planning on delivering."

**Discussion**

We first consider whether the evidence links Appellant to the contraband. *See **Poindexter***, 153 S.W.3d at 406. We begin by noting that Appellant was not under the influence of narcotics, did not possess other narcotics, and did not attempt to flee. Further, there was no evidence that Hickey detected the odor of contraband and it did not appear from the video that Appellant easily could access the contraband.

On the other hand, it is undisputed that Appellant was the registered owner and sole occupant of the vehicle. Appellant was present when Hickey conducted his search of the vehicle. And while the contraband was not in plain view, the backpack and lock box where it was found amounted to an enclosed space, with the backpack's having Appellant's name on it and the lock box's containing bank documents in Appellant's name. Appellant also made several statements about there being potential marijuana residue in the vehicle and other statements, which Hickey believed amounted to Appellant's attempt to blame others for the presence of any contraband found in the vehicle. Furthermore, small baggies, a scale, needles, and spoons were discovered in the area in which the contraband was found. Moreover, Appellant was found in possession of six hundred dollars in cash and the jury was able to observe Appellant's several minutes of rambling statements, from which it reasonably could conclude indicated his extreme nervousness resulting from consciousness of guilt.

We next consider whether there is sufficient evidence to support that Appellant "intended to deliver" the methamphetamine at issue. While the nature of the location where he was arrested is not indicative of such intent, the quantity of methamphetamine Appellant possessed was

15

immense, particularly in light of the testimonies of several of the officers that it was the largest amount of methamphetamine any of them had encountered in their many, respective years of law enforcement experience. Moreover, the methamphetamine at issue was packaged in large bags with many smaller baggies present, along with a scale, several needles, and spoons. Furthermore, the jury heard testimony from several officers that this was consistent with someone who was dealing methamphetamine rather than someone who was simply a user. Lastly, officers located six hundred dollars in cash, and the jury heard testimony from Osario that it was common knowledge among local law enforcement officers that Appellant was "hauling drugs."

Having examined the evidence in the light most favorable to the verdict, we conclude that the jury reasonably could have determined beyond a reasonable doubt that Appellant exercised control, management, or care over the methamphetamine at issue, which he knew to be contraband, and did so with intent to deliver. *See **Poindexter***, 153 S.W.3d at 405; *see also **Kibble***, 340 S.W.3d at 18–19. Therefore, we hold that the evidence is legally sufficient to support the trial court's judgment. Appellant's second issue is overruled.


## VOIR DIRE - CHALLENGES FOR CAUSE

In his third issue, Appellant argues that the trial court abused its discretion by granting the State's challenge for cause for two venire members, each of whom vacillated when answering questions about whether they would be able to consider the full range of punishment.

### Standard of Review and Governing Law

The court of criminal appeals reviews a trial court's ruling on a challenge for cause with "considerable deference" because the trial judge is in the best position to evaluate a juror's demeanor and responses. ***Gardner v. State***, 306 S.W.3d 274, 295–96 (Tex. Crim. App. 2009). A trial judge's ruling on a challenge for cause "may be reversed only for a clear abuse of discretion." ***Id.*** at 296. "When a venire member's answers are ambiguous, vacillating, unclear, or contradictory, we give particular deference to the trial court's decision." ***Id.*** If a venire member vacillated with respect to his ability to follow the law, the appellate court must defer to the trial court's judgment. ***Brown v. State***, 913 S.W.2d 577, 580 (Tex. Crim. App. 1996).

Importantly, even if the trial court erred in granting the State's challenge to the prospective jurors, this Court must disregard the error unless it affected Appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b). A defendant does not have the right to have a particular individual sit on

16

the jury; rather, a defendant's "only substantial right is that the jurors who do serve be qualified." *Jones v. State*, 982 S.W.2d 386, 393 (Tex. Crim. App. 1998). Thus, error in excusing a prospective juror requires reversal "only if the record shows that the error deprived the defendant of a lawfully constituted jury." *Jones*, 982 S.W.2d at 394; *see also Gray v. State*, 233 S.W.3d 295, 301 (Tex. Crim. App. 2007) (the erroneous exclusion of potential juror did not merit reversal because defendant did not show he had not "received a trial by an impartial jury comprised of qualified individuals"). If the jurors who serve are qualified, then the jury is lawfully constituted, the defendant's substantial rights are not affected, and reversal of the defendant's conviction based on the erroneous granting of a challenge for cause is unnecessary. *See Jones*, 982 S.W.2d at 392; *see also Moore v. State*, 54 S.W.3d 529, 538 (Tex. App.–Fort Worth 2001, pet. ref'd).

**Discussion**

In the case at hand, both Venirepersons 30 and 43 held their cards up to affirmatively answer the prosecutor's question, "Look, honestly, I don't care what bad or ugly stuff I hear about the defendant. Just, for whatever reason, I couldn't consider sentencing somebody to the maximum of 99 years or life for this type of offense?" Later, during Appellant's voir dire, the same two jurors indicated that: "under the right circumstances and facts, and if the law allowed it, [they] could consider the full range of punishment, depending on the facts[.]" Appellant objected to the State's challenge for cause based on the two venire members' inability to follow the law and consider the full range of punishment, arguing that they had been rehabilitated during his voir dire examination. The trial court granted the State's challenges for cause because the venire members each vacillated on the issue.

We reiterate that we must give "considerable deference" to the trial court's decision because the trial judge is in the best position to evaluate a juror's demeanor and responses. *See Gardner*, 306 S.W.3d at 295–96. Here, it is apparent from the record that the two venire members each respectively vacillated in answering the question on whether they could consider the maximum punishment under the law depending on whether the prosecutor or defense counsel was asking the question. Therefore, we hold that the trial court did not abuse its discretion in granting the State's challenges for cause on that basis. *See id.* at 296; *Brown*, 913 S.W.2d at 580.

Furthermore, even if the trial court's decision did amount to an abuse of discretion, the outcome would not change. Appellant has made no argument, nor does the record reflect, that any of the venire members who ultimately served on the jury were unqualified. Thus, we hold that

17

even if the trial court abused its discretion, Appellant's substantial rights were not affected. *See Jones*, 982 S.W.2d at 392; *see also Moore*, 54 S.W.3d at 538. Appellant's third issue is overruled.

<strong>PROSECUTORIAL STATEMENTS DURING JURY ARGUMENT</strong>

In his fourth issue, Appellant argues that the prosecutor engaged in improper argument when he "struck at him over the shoulders of defense counsel" during jury argument at his trial on punishment.

**Standard of Review and Governing Law**

We review challenges to rulings on objections to closing argument for abuse of discretion. *Lemon v. State*, 298 S.W.3d 705, 707 (Tex. App.–San Antonio 2009, pet. ref'd). Permissible jury argument generally consists of (1) summation of the evidence, (2) reasonable deductions from the evidence, (3) responses to opposing counsel's arguments, and (4) pleas for law enforcement. *Milton v. State*, 572 S.W.3d 234, 239 (Tex. Crim. App. 2019); *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). Argument that strikes at a defendant over the shoulders of defense counsel is improper. *Gallo v. State*, 239 S.W.3d 757, 767 (Tex. Crim. App. 2007). "[T]he State may not strike at a defendant over the shoulders of his counsel or accuse defense counsel of bad faith and insincerity." *Fuentes v. State*, 664 S.W.2d 333, 335 (Tex. Crim. App. 1984). A prosecutor risks improperly striking at a defendant over his counsel's shoulders "when the argument is made in terms of defense counsel personally and when the argument explicitly impugns defense counsel's character." *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).

**Discussion**

We first note that Appellant failed to object to the prosecutorial statements of which he now complains and has, therefore, failed to preserve any error on his fourth issue. *See* TEX. R. APP. P. 33.1. Nonetheless, Appellant argues that the statements at issue are so prejudicial that they can amount to fundamental error. They cannot. *See Hernandez v. State*, 538 S.W.3d 619, 622–23 (Tex. Crim. App. 2018) ("[t]he right to a trial untainted by improper jury argument is forfeitable"); *Owens v. State*, 549 S.W.3d 735, 744 (Tex. App.–Austin 2017, pet. ref'd) ("To preserve a complaint about improper jury argument for appellate review, a defendant must object and pursue the objection to an adverse ruling. A defendant must object at the earliest opportunity to prevent waiver of an issue on appeal"); *see Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim.

18

App. 2007) ("To preserve error in prosecutorial argument, a defendant must pursue to an adverse ruling his objections to jury argument"); ***Lewis v. State***, No. 12-09-00297-CR, 2010 WL 2998749, at *3 (Tex. App.–Tyler July 30, 2010, no pet.) (mem. op., not designated for publication) (impermissible jury argument is not fundamental error); *see also* ***Powell v. State***, 252 S.W.3d 742, 744–45 (Tex. App.–Houston 2008, no pet.) (describing fundamental error in terms of "structural defects in the constitution of the trial mechanism," which include right to counsel, right to impartial judge, right to not have members of defendant's race unlawfully excluded from grand jury, right to self-representation at trial, and right to public trial). However, even assuming arguendo that Appellant objected to the prosecuting attorney's statement, the outcome would not change.

In the instant case, the record reflects that during his closing argument, Appellant's counsel referred repeatedly to Appellant's four young daughters and sought the jury's leniency on their behalf. Specifically, Appellant's counsel stated to the jury as follows:

> I'm afraid. I am afraid. I'm not afraid for my client. I'm afraid for those four little girls and that family. I heard the testimony that you heard, and it's overwhelming.

> You know, the State gets up here and they talk about the endless possibilities of where these drugs could have gone and the people they could have affected. And all that's true. They could have. They didn't, thank God. But they could have.

> But I know the people who it has affected, it will affect, for sure. And you got to meet some of them yesterday. And there are more. There are more people that are family in Justin's life and in those little girls' lives who are going to be affected.

> . . . .

> We also need to put on here these numbers (writing on board). Their lives are affected[,] and they will be affected, as well as my client's. This is not just his sentence. This is all of their sentence.

> It's his fault. We're not saying it's not. Absolutely it is. He's going to do that time. But so are they. And that's important. That's not a rabbit trail. Those are facts. Those are important facts to consider, you know.

> . . . .

> She's got to protect those little girls and she's got to make sure that they're raised up right. And no matter what's happened, she still believes in Justin, and she still believes that he deserves a chance to be in their lives; and that's powerful testimony -- especially from somebody who's divorced and, you know, didn't have to be here and tell us any of that.

> You know, all these people are Christians and all them believe in God, including my client. And it reminds me, you know, of a story where Jesus left the 99 to go back and get the one. And these are the things that matter. These are the people whose lives are affected by your decision. And I know that you'll do the right thing . . . [.]

19

. . . .

Sure, you can put a life sentence on Mr. Hammontree, but it certainly would be wrong. That would be a savage sentence. And it's like counsel says, you're not just sentencing Justin Hammontree. You're sentencing, essentially, the family with him.

. . . .

And . . . he decided that when he had children, he would be the model father, the best father he could be.

And what he did was, during this time, before he got on this methamphetamine and all these drugs out there, he took care of those children. He was the one that got them off to school every morning. His wife was going to school. He was the sole support for that. That's the kind of man he is and that's the kind of man he will be.

. . . .

So you know, you lock him up for life? I guess so. At least for 30 years, I suppose -- or 15 as counsel says. That will keep him off the meth. But what will it do for those kids? Oldest one will be 27 years old. Youngest one will be 18, 19 years old, regardless if he gets a life sentence. They won't know their daddy. He'll be off at the penitentiary. Is that what you want? Certainly not what I want.

. . . .

Give him that 15 years. What that will do -- if he makes it, yeah, he'll get out in a pretty short sentence, five or six years out of here, be back on parole, supervised. Have to get regular drug tests. But he'll have an opportunity to be with those little girls and raise them up, just like he has before. That's justice. That's a sentence that this community can live with. And sending a message to the community is this: You will get justice in Smith County for who you are and the circumstances.

Appellant now complains of the following portion of the State's rebuttal:

And on the subject of children, another reason I stayed up last night, is I knew this was coming. Because in my experience, this is right out of the playbook for the defense on these kind of cases: Make you feel guilty for the children.

And that sickens me. Why? Three-year-old Ruby, when he was out with this meth, he didn't care about her. Was she in his mind when he was out running dope? Nope. Five-year-old, was she in his mind out running dope? Nope. The eight-year-old, was she in his mind when he was out running dope? Nope. The 11-year-old in his mind out running dope? Nope.

Were they in his mind when he had syringes and guns and dope where they could get to that could kill them or hurt them? No. And they want to come in here and use those children as a pawn to give him a break. Sickening. It's sickening.

In his brief, Appellant acknowledges that "there is no precise rule regarding the kinds of arguments that mock a defense attorney's 'playbook,' [but that] it is fair to say that a prosecutor runs a risk of improperly striking at a defendant over the shoulder of counsel when the argument

20

is made in terms of defense counsel personally and when the argument explicitly impugns defense counsel's character." We disagree that the prosecutor's statement either addressed defense counsel personally or that it explicitly impugned defense counsel's character. *See Mosley*, 983 S.W.2d at 259; *Fuentes*, 664 S.W.2d at 335. Instead, the prosecutor's argument was made in response to defense counsel's repeated pleas to the jury to consider the impact of a lengthy sentence on Appellant's four young daughters. Responding to the arguments of defense counsel is a permissible form of jury argument. *See Milton*, 572 S.W.3d at 239; *Brown*, 270 S.W.3d at 570. Appellant's fourth issue is overruled.

## COURT COSTS

In his fifth issue, Appellant argues that the trial court improperly assessed certain court costs in its judgment. Specifically, he argues the trial court erroneously assessed costs for the local consolidated fee, the time payment fee, and the county and state judicial support fee and records management and preservation fee.

### Standard of Review and Applicable Law

We review the assessment of court costs on appeal to determine if there is a basis for the cost, not to determine if there was sufficient evidence offered at trial to prove each cost, and traditional *Jackson v. Virginia* evidentiary-sufficiency principles do not apply. *Johnson v. State*, 423 S.W.3d 385, 389–90 (Tex. Crim. App. 2014). Appellant need not have objected at trial to raise a claim challenging the bases of assessed costs on appeal. *Johnson*, 423 S.W.3d at 391. Court costs may not be assessed against a criminal defendant for which a cost is not expressly provided by law. *See* TEX. CODE CRIM. PROC. ANN. art. 103.002 (West 2018). When a trial court improperly includes amounts in assessed court costs, the proper appellate remedy is to reform the judgment to delete the improper fees. *Cates v. State*, 402 S.W.3d 250, 252 (Tex. Crim. App. 2013).

### Local Consolidated Fee

The State concedes that the "Local Consolidated Fee on Conviction of Felony" improperly was assessed. The date of Appellant's charged offense is October 23, 2019. The Local Consolidated Fee on Conviction of Felony only applies to defendants who are convicted of offenses committed on or after January 1, 2020. TEX. LOC. GOV'T CODE ANN. § 134.101 (West Supp. 2021). Section 134.101 assesses an additional $105 fee for persons convicted of felonies. *Id.* § 134.101(a). That $105 fee is to be allocated to the following specific accounts and funds: the

21

clerk of the court account, the county records management and preservation fund, the county jury fund, the courthouse security fund, the county and district court technology fund, and the county specialty court account. *Id.* § 134.101(b).

The bill of costs in Appellant's case includes the following costs as enumerated in Section 134.101: $40.00 Clerk of the Court, $4.00 County and District Court Technology Fund, $1.00 County Jury Fund, $25.00 County Records Management and Preservation, $25.00 County Specialty Court Account, and $10.00 Courthouse Security Fund. These total $105 in fees. Per the statute's effective date, Appellant is not obligated to pay the Local Consolidated Fee on Conviction of Felony. *See Hayes v. State*, No. 12-20-00222-CR, 2021 WL 1418400, at*2 (Tex. App.–Tyler Apr. 14, 2021, no pet.) (mem. op., not designated for publication). Accordingly, we will modify the trial court's judgment and Order to Withdraw Funds to delete these fees. *See Cates*, 402 S.W.3d at 252. This portion of Appellant's fifth issue is sustained.

**Time Payment Fee**

The State concedes that the fifteen-dollar time payment fee listed in the Bill of Costs is prematurely assessed. The court of criminal appeals has held that the pendency of an appeal "stops the clock" for the purposes of the time payment fee. *Dulin v. State*, 620 S.W.3d 129, 133 (Tex. Crim. 2021). Consequently, the assessment of the time payment fee in Appellant's case is premature and should be struck in its entirety, without prejudice to its being assessed later if, more than thirty days after the issuance of the appellate mandate, the defendant has failed completely to pay any fine, court costs, or restitution that he owes. *Id.*

Here, the judgment includes a document identified as "Attachment A Order to Withdraw Funds," which states that Appellant has incurred "[c]ourt costs, fees and/or fines and/or restitution" in the amount of $249, an amount which is fifteen dollars less than the $264.00 total assessed in the Bill of Costs and the judgment. Therefore, it appears from the record that the fifteen-dollar time payment fee of which Appellant complains was not, in fact, assessed in the order to withdraw funds. This portion of Appellant's fifth issue is sustained in part.

**County and State Judicial Support Fees and Records Management and Preservation Fees**

The Bill of Costs in this case also includes the following fees: $0.60 for the "Judicial Support Fee – (County)," $5.40 for the "Judicial Support Fee – (State)," and $25.00 for the "Records Management & Preservation Fee." These costs were authorized under former Section 133.105 of the Texas Local Government Code. *See* TEX. LOC. GOV'T CODE ANN. § 133.105(a)

(West 2019), *repealed by* Act of May 23, 2019, 86th Leg., R.S., ch. 1352, § 1.19(12), 2019 Tex. Sess. Law Serv. 3982 (eff. Jan. 1, 2020). During its 86th Regular Session, the Texas Legislature comprehensively revised the statutory array of criminal court costs and fees imposed on conviction (the Act). *See generally* Act of May 23, 2019, 86th Leg., R.S., ch. 1352, 2019 Tex. Sess. Law Serv. 3982 (eff. Jan. 1, 2020). Yet, "[e]xcept as otherwise provided by" the Act, "the changes in the law made by" the Act "apply only to a cost, fee, or fine on conviction for an offense committed on or after the effective date of" the Act, that is January 1, 2020. Act of May 23, 2019, 86th Leg., R.S., ch. 1352, § 5.01, 2019 Tex. Sess. Law Serv. 3982, 4035–36. An offense committed before the Act's effective date "is governed by the law in effect on the date the offense was committed, and the former law is continued in effect for that purpose." *Id.*

Here, Appellant argues that because Section 133.105 has been repealed, the costs are inappropriately assessed. However, Appellant makes no reference to the savings clause in his brief. *See id.* Because the offense in this case was alleged to have been committed on October 23, 2019, Section 133.105(a) applies. *See id.* Thus, we hold that these fees appropriately were assessed. This portion of Appellant's fifth issue is overruled.

**Summation**

In the instant case, the judgment reflects that the trial court assessed $264.00 in court costs. The judgment includes a document identified as "Attachment A Order to Withdraw Funds," which states that Appellant has incurred "[c]ourt costs, fees and/or fines and/or restitution" in the amount of $249.00. As set forth above, the certified bill of costs includes costs assessed pursuant to Section 134.101 totaling $105.00, which Appellant is not obligated to pay. *See Hayes*, 2021 WL 1418400, at *2. Accordingly, we will modify the trial court's judgment and Order to Withdraw Funds to reflect the removal of these fees. *See* TEX. R. APP. P. 43.2(b); *Reyes v. State*, 324 S.W.3d 865, 868 (Tex. App.–Amarillo 2010, no pet.). Furthermore, because the fifteen-dollar time payment fee was prematurely assessed in the judgment but does not appear to have been included in the Order to Withdraw Funds, we will modify the Bill of Costs and judgment to remove it. *See Foley v. State*, No. 12-20-00017-CR, 2021 WL 4898457, at *6 (Tex. App.–Tyler Oct. 20, 2021, pet. ref'd) (mem. op., not designated for publication) (modifying bill of costs by deleting time payment fee). Appellant's fifth issue is sustained in part and overruled in part.

**CONCLUSION**

We have sustained Appellant's fifth issue in part. Having done so, we *modify* the trial court's judgment to reflect that the amount of court costs is $144.00. We also *modify* Attachment A Order to Withdraw Funds to state that the total amount of "court costs, fees and/or fines and/or restitution" is $144.00. We further *modify* the Bill of Costs by deleting the items comprising the Local Consolidated Fee on Conviction of Felony totaling $105.00, as well as the fifteen-dollar time payment fee, without prejudice to its being assessed later if, more than thirty days after the issuance of the appellate mandate, the defendant has failed completely to pay any fine, court costs, or restitution that he owes. Having overruled the remainder of Appellant's fifth issue, as well as his first, second, third, and fourth issues, we *affirm* the trial court's judgment *as modified*.

**BRIAN HOYLE**
Justice

Opinion delivered July 29, 2022.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

24

(DO NOT PUBLISH)



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**JULY 29, 2022**

**NO. 12-21-00139-CR**

**JUSTIN ALLEN HAMMONTREE,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 7th District Court
of Smith County, Texas (Tr.Ct.No. 007-0102-20)

THIS CAUSE came to be heard on the appellate record and the briefs filed herein, and the same being considered, it is the opinion of this court that the judgment of the court below should be modified and as modified, affirmed.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below be **modified** to reflect that the amount of court costs is $144.00. We also *modify* Attachment A Order to Withdraw Funds to state that the total amount of "court costs, fees and/or fines and/or restitution" is $144.00. We further *modify* the Bill of Costs by deleting the items comprising the Local Consolidated Fee on Conviction of Felony totaling $105.00, as well as the fifteen-dollar time payment fee, without prejudice to its being assessed later if, more than thirty

days after the issuance of the appellate mandate, the defendant has failed completely to pay any fine, court costs, or restitution that he owes; in all other respects the judgment of the trial court is **affirmed**; and that this decision be certified to the court below for observance.

> Brian Hoyle, Justice.
> *Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*